# EXHIBIT A

# Maryland Judiciary Case Search

### NOTICE: Available

# Case Detail

## Case Information

Court System: **Circuit Court For Prince George's County - Civil**
Location:      **Prince Georges Circuit Court**
Case Number: **C-16-CV-25-004615**
Title:         **Elena Pereira vs. Freedom Forever Maryland, LLC**
Case Type:    **Tort - Misrepresentation**
Filing Date:   **08/15/2025**
Case Status:   **Open**

## Involved Parties Information

### Resident Agent

Name: **CSC-Lawyers Incorporating Svc. Co.**

Address: **7 St. Paul Street**
          **Suite 820**
City:       **Baltimore**    State: **MD**    Zip Code: **21202**

### Defendant

Name: **Freedom Forever Maryland, LLC**

Address: **Serve on:**
          **CSC- Lawyers Incorporating Svc. Co.**
City:       **BALTIMORE**    State: **MD**    Zip Code: **21202**

### Plaintiff

Name: **Pereira, Elena**

Address: **4804 Olympia Ave.**
City:       **Beltsville**    State: **MD**    Zip Code: **20705**

### Attorney(s) for the Plaintiff

Name:              **Hills, Derek A.**

Appearance Date: **08/15/2025**
Address Line 1:  **129 N. West Street**
Address Line 2:  **Suite 1**
City:            **EASTON**   State:  **MD**   Zip Code:  **21601**


Name:            **HOLLAND, PETER A**
Appearance Date: **08/15/2025**
Address Line 1:  **914 BAY RIDGE ROAD**
Address Line 2:  **SUITE 230**
City:            **ANNAPOLIS**   State:  **MD**   Zip Code:  **21403**

# Document Information

File Date:       **08/15/2025**
Document Name: **Complaint / Petition**
Comment:         **Complaint and Demand for Jury Trial**

---

File Date:       **08/15/2025**
Document Name: **Supporting Exhibit**
Comment:         **Ex. 1**

---

File Date:       **08/15/2025**
Document Name: **Case Information Report Filed**
Comment:         **Case Information Report**

---

File Date:       **08/15/2025**
Document Name: **Attorney Appearance - $10 Fee**
Comment:         **Line of Attorney Appearance DH**

---

File Date:       **08/15/2025**
Document Name: **Attorney Appearance - $10 Fee**
Comment:         **Line of Attorney Appearance PH**

---

File Date:       **08/15/2025**
Document Name: **Request to Issue**
Comment:         **Requet to Issue Summons**

---

File Date:       **08/18/2025**
Document Name: **Summons Issued (Service Event) - New Case**
Comment:         **Sent to Attorney for service.**

---

File Date:       **08/18/2025**
Document Name: **Writ /Summons/Pleading - Electronic Service**

Comment:              **Summons**

---

## Service Information

| Service Type | Issued Date |
|---|---|
| **Summons Issued** | **08/18/2025** |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland Rules, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

Copyright © 2025. Maryland Judiciary. All rights reserved.

Service Desk: (410) 260-1114

## IN THE CIRCUIT COURT OF MARYLAND FOR
## PRINCE GEORGE'S COUNTY

RB

| | |
|---|---|
| ELENA PEREIRA <br> 4804 Olympia Ave. <br> Beltsville, MD 20705 <br><br> *Plaintiff,* <br><br> v. <br><br> FREEDOM FOREVER MARYLAND, LLC <br> 43445 Business Park Drive, Suite 104 <br> Temecula, CA 92590 <br> *Serve on:* <br>     CSC-Lawyers Incorporating Svc. Co. <br>     7 St. Paul Street, Suite 820 <br>     Baltimore, MD 21202 <br><br> *Defendant.* | Case No. C-16-CV-25-004615 <br> _____ <br><br> **JURY TRIAL DEMANDED** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiff, Elena Pereira, by and through undersigned counsel, files this Complaint

against Defendant, Freedom Forever Maryland, LLC, and states as follows:

### PARTIES JURISDICTION AND VENUE

1.    Plaintiff, Elena Pereira, is an adult individual who owns a single-family

residence located at 4804 Olympia Avenue, Beltsville, MD 20705.

2.    Defendant, Freedom Forever, LLC, ("Freedom Forever") is a foreign limited

liability company organized under the laws of the State of Delaware with a principal office

at 43445 Business Park Drive, Suite 104, Temecula, CA 92590, does business in Prince

George's County, Maryland, and is registered to do business in Maryland.

3.    This Court has subject matter jurisdiction over this action pursuant to Md.

Code Ann., Cts. & Jud. Proc. § 1-501, which grants the circuit courts original jurisdiction

over all civil actions in which equitable relief is sought or where the amount in controversy

exceeds $30,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over the Defendant pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103(b), as the Defendant regularly conducts business in Maryland, contracted to supply services and goods in Maryland, and caused tortious injury in Maryland by acts or omissions within the state.

5.      Venue is proper in the Circuit Court for Prince George's County, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201(a), because the events giving rise to this action occurred in Prince George's County, the Plaintiff resides in Prince George's County, and the property that is the subject of this dispute is located in Prince George's County.

6.      Specifically, the Plaintiff, Elena Pereira, resides at 4804 Olympia Avenue, Beltsville, Maryland 20705, which is in Prince George's County. The Defendant marketed, sold, financed, and installed the solar energy system at this location, and their conduct has caused harm to the Plaintiff within this jurisdiction.

### STATEMENT OF FACTS

7.      Plaintiff, Elena Pereira, owns a single-family home in Beltsville, MD. Ms. Pereira is 73 years old and lives on a fixed income. To afford her home, Ms. Pereira rents out rooms in her home to several tenants. Ms. Pereira moved to the United States from Brazil, and although she speaks and understands some English, her native language is Brazilian Portuguese.

8.      Ms. Pereira's electrical utility provider is Pepco. Her house is also supplied with natural gas, which is used to heat her home.

9.      On or about July 13, 2022, a salesperson from Freedom Forever named Thiego Freitas visited Ms. Pereira's home to discuss the installation of a residential solar panel system ("System"). Mr. Freitas is also Brazilian, and Ms. Pereira felt comfortable talking with him in her native language.

10.    During this meeting, Mr. Freitas informed Ms. Pereira that he was selling residential solar systems for Freedom Forever, and that she could save money on her electricity bills if she signed up to have the System Installed on the roof of her home. Mr. Freitas informed her that Freedom Forever would need to remove a large tree from her front yard and replace the roofing on the front of her home. Mr. Freitas informed Ms. Pereira that all these costs would be included.

11.    Mr. Freitas presented Ms. Pereira with his computer and obtained her signature after instructing her on where to sign. Mr. Thiego did not explain what Ms. Pereira was signing. Despite Ms. Pereira's clear indication that she did not regularly use email or computers—relying instead on limited smartphone usage—she did not receive any paper or electronic copies in her native language.

12.    What Ms. Pereira signed was an agreement ("Agreement") to participate in the Freedom Forever – Vivint Smart Home Promotion. This Agreement outlines the terms for the installation of the System. A true and correct copy of the Agreement is attached as **Exhibit 1**.

13.    The Agreement included a "partial reroof" of Ms. Pereira's home.

14.    The Agreement excluded tree work, structural engineering, and other costs as follows:

2.2    Exclusions. Any alteration or deviation from the above specifications, including but not limited to any additional material and/or any labor costs incurred by such alteration or deviation, are not part of the Work, and shall only be executed pursuant to <u>ARTICLE 6</u> of this Agreement, with the costs solely borne by the Customer. These alteration and deviation include but are not limited to:

    a.    Upgrade of existing main service panels, sub-panels or switchboards (if necessary)
    b.    Upgrade, replacement or repair of existing roof, or supporting roof structure.
    c.    Tree removal, fencing, weed abatement, curbing, gravel or landscaping.
    d.    Non-standard groundwork (such as on difficult soil conditions).
    e.    Additional grading, rock/boulder removal, blasting; coring; soil testing, compaction for footings, and trenching.
    f.    Structural engineering calculations or analysis of existing structures.
    g.    Habitat studies, additional inspections or fees of any type.
    h.    Additional permitting requirements by local building authorities or jurisdictions, such as zoning, land use, architecture, planning, habitat, environmental, etc.
    i.    Additional exclusions described on page one of this Agreement, initialed by both Parties.

15.     On July 13, 2022, at 12:20 pm, Ms. Pereira received an email from Freedom Forever with an electronic copy of the Agreement. According to the Agreement, the total installed System price, including all finance charges, was $32,857.55. She was unable to understand the Agreement because she could only read it on her phone, and it was not in her native language.

16.     At 2:38 pm on July 13, 2022, Ms. Pereira received an email stating that she had been approved for third-party financing with a loan amount of up to $75,000. However, Ms. Pereira did not receive a copy of any loan documents.

17.     The alleged loan included additional costs beyond the System itself, such as costs for roof replacement and tree removal, which Mr. Freitas, the Freedom Forever salesperson, arranged. These additional costs were not disclosed in the Agreement or the alleged loan.

18.     In late 2022 or early 2023, Freedom Forever, through its subcontractor, replaced the roofing materials on the southern face of Ms. Pereira's home, removed a large tree in her front yard, and installed the System on the newly installed roof.

19.     In performing the roofing work and the installation of the System, Freedom Forever effectively provided Ms. Pereira with a roofing warranty, but limited the warranty of the new roof to 10 years without expressly informing Ms. Pereira, and did not provide any details of the roofing manufacturer's warranty.

**The Freedom Forever Promise\***

We provide a money-back energy production guarantee.

We warrant all of our roofing work.

We warrant and repair the system (as defined below).

We fix or pay for any damage we may cause to your property.

We provide 24/7 web-enabled monitoring at no additional cost.

*\*Please refer to specific terms in your Supply and Installation Agreement*

**ARTICLE 7 – LIMITED WARRANTY**

7.1    Free of Material, Construction and Workmanship Defect. Subject to the limitations and other provisions of this Agreement, Freedom Forever warrants that the Work and the System will be free from defects in material, construction and workmanship ten (10) years following the Completed Installation (the "Limited Warranty"). Freedom Forever warrants the roof of the Property against damage and water infiltration at each roofing penetration made by Freedom Forever in connection with the installation of the System (the "Covered Roof Area"); provided however that such roof penetration warranty shall be void and voidable if work is performed by Customer or Customer's contractors on the roof during the ten (10) year period. **This is not a warranty of the entire roof.** If the roof has an existing warranty, Customer has the sole responsibility of confirming with the roofing contractor who performed the work that the installation of the System will not void any warranty. If the Work will void any existing roof warranty, the Customer proceeds knowing that this is the case. Any claim under the Limited Warranty must be made before the expiration of the Limited Warranty.

20.    The System was approved for operation on February 21, 2023.

21.    In 2023, Ms. Pereira began to notice a significant and unexpected increase in her utility bills.

22.    Throughout 2023, Ms. Pereira made multiple attempts to contact Mr. Freitas to address these billing concerns, but her calls and messages went unanswered. She then reached out to Freedom Forever's customer support, where representatives repeatedly assured her that the System was functioning properly and that no issues were detected.

23.    On August 10, 2023, Freedom Forever provided Ms. Pereira with solar production reports, confirming that the System was generating energy. However, despite these assurances, her utility bills remained excessively high, leading her to suspect that the issue might be due to a malfunctioning component.

24.     On or about October 25, 2023, Ms. Pereira received a copy of the loan for the purchase of the System, and she learned for the first time that she would incur a finance charge of $12,578.60 over the 30-year term, in addition to the $35,857.56 amount financed represented in the Agreement.

25.     The initial disbursement to Freedom Forever was for $16,428.78, or 50% of the project cost, which exceeded one-third of the contract price, in violation of Md. Code Ann, Bus. Reg. 8-617.

26.     In early 2024, after persistent follow-ups, a technician from Freedom Forever finally visited Ms. Pereira's property. The technician identified a problem with the System's inverter, which could explain the unusually high energy bills. Despite acknowledging this issue, Freedom Forever took no corrective action to resolve the malfunction.

27.     On February 28, 2024, after exhausting efforts with Freedom Forever, Ms. Pereira contacted Pepco, her utility provider, to investigate whether the issue might be related to the utility's net metering system. A Pepco representative confirmed that her metering system was working properly.

28.     In December 2024, Ms. Pereira's household electrical usage was 3309 kWh, which was nearly double her usage in December 2023.

29.     In January 2025, Ms. Pereira's household electrical usage was 5082 kWh, which was approximately double her usage in January 2024.

30.     Despite these increased costs, Ms. Pereira's household utility needs have remained relatively unchanged over several years.

31.     On or about February 25, 2025, Ms. Pereira, through counsel, mailed Freedom Forever a demand to inspect the System and reimburse her for excess utility

costs incurred due to its malfunction.

32.     On or about March 12, 2025, Freedom Forever responded to Ms. Pereira's demand, stating it denies all allegations raised in the demand letter concerning the System, and asserting that the System met its contractual energy production requirements—achieving approximately 90% of the guaranteed annual kilowatt-hours for the first year—and passed county inspection. Despite this, Freedom Forever did not inspect the System based on Ms. Pereira's concerns.

33.     As a result of the Defendant's conduct, Ms. Pereira is obligated to repay a 30-year loan for a System, in addition to paying her monthly electrical utility bills, which have nearly doubled. This has caused Ms. Pereira to experience undue financial hardship and emotional distress that has physically manifested in loss of sleep, depression, crying, and anxiety.

## COUNT I: DECLARATORY JUDGMENT

34.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

35.     The Electronic Signatures in Global and National Commerce Act ("ESIGN") governs the validity and enforceability of electronic signatures and electronic records in consumer transactions, codified at 15 U.S.C. § 7001 et seq. To ensure the enforceability of electronic records and signatures, the ESIGN Act mandates specific consumer protections, including:

   a.  That the consumer affirmatively consents to receive electronic disclosures in a conspicuous and informed manner (15 U.S.C. § 7001(c)(1)(A));

   b.  That the consumer, *prior to consenting,* is provided with disclosures in a form

that can be retained and accurately reproduced (15 U.S.C. § 7001(c)(1)(C)(ii)); and

c. That the consumer, *prior to consenting*, receives clear and conspicuous disclosures regarding the right to receive paper copies, withdraw consent, and the hardware/software requirements (15 U.S.C. § 7001(c)(1)(B)).

d. Where a contract or other record relating to a transaction in or affecting interstate or foreign commerce be in writing, **the legal effect, validity, or enforceability of an electronic record of such contract or other record may be denied if such electronic record is not in a form that is capable of being retained and accurately reproduced for later reference by all parties or persons who are entitled to retain the contract or other record.** 15 U.S.C. § 7001(e) (emphasis added).

36.    The Defendant is subject to the requirements of the ESIGN Act because it engages in consumer credit transactions that require written disclosures under federal law, including those mandated by the Truth in Lending Act (TILA).

37.    Defendant failed to obtain Plaintiff's affirmative consent to receive electronic disclosures in a manner that was conspicuous and informed, as required under 15 U.S.C. § 7001(c)(1)(A).

38.    Although the salesperson knew that Ms. Pereira did not use computers, did not have a printer, and that English was not her native language, Defendant failed to provide her with copies of the Agreement and other related disclosures in a form that could be retained and accurately reproduced for later reference, as required under 15 U.S.C. § 7001(c)(1)(C)(ii).

39.    The Agreement was executed using DocuSign, but Defendant did not

provide Ms. Pereira with a complete and accurate electronic copy of the signed Agreement that could be saved or printed for future reference.

40.    Defendant failed to provide Ms. Pereira with a clear and conspicuous statement containing required disclosures under 15 U.S.C. § 7001(c)(1)(B), including:

   a. The right to receive disclosures in paper form;

   b. The right to withdraw consent and the procedures for doing so; and

   c. The hardware and software requirements necessary to access and retain electronic records.

   d. The disclosures provided to the Plaintiff were buried within lengthy electronic documents, lacking clear or conspicuous headings or formatting that would make them easily identifiable or understandable.

41.    As a result, Ms. Pereira did not give valid electronic consent, and the electronic disclosures provided by Defendant are invalid and ineffective.

42.    The Maryland Uniform Electronic Transactions Act (MUETA), Md. Code Ann., Com. Law § 21-101 et seq. mirrors the ESIGN Act in imposing certain obligations for electronic contracts. Specifically, MUETA requires the consumer's affirmative consent to conduct transactions electronically, and it mandates that the consumer be able to retain a copy of the Agreement (Md. Code Ann., Com. Law § 21-104(b)).

43.    The ESIGN Act violations are material because they prevented Plaintiff from:

   a. Exercising her right to receive disclosures in paper form or to withdraw consent to electronic disclosures;

   b. Retaining accurate copies of the loan documents and related disclosures; and

   c. Making an informed decision regarding the credit transaction, including the

ability to compare alternative credit terms.

44. Defendant's failure to comply with the ESIGN Act caused Ms. Pereira particularized and concrete harm, including but not limited to:

a. Being misled into consenting to electronic disclosures without informed consent, thus undermining her ability to make an informed decision.

b. Deprivation of accurate records of the loan, which affected Plaintiff's ability to understand and enforce her contractual rights.

c. Informational injury due to the lack of clear and conspicuous disclosures, which prevented Plaintiff from understanding her rights under federal law.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. That Defendant violated the ESIGN Act;

B. That Plaintiff did not give valid electronic consent under the ESIGN Act;

C. That the electronic disclosures and signatures are invalid and ineffective for purposes of satisfying the disclosure requirements of TILA;

D. That the Agreement is void and unenforceable due to non-compliance with the ESIGN Act;

E. Attorney's fees and costs;

F. Such other relief as the Court deems just and proper.

## COUNT II: Breach of Express and Implied Warranties
## (Md. Code Ann., Com. Law §§ 2-313, 2-314, 2-315)

45. The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

46. On or about July 13, 2022, Plaintiff electronically signed an Agreement with Defendant Freedom Forever for the sale and installation of the System, including tangible

components such as solar panels, an inverter, and related equipment. Plaintiff did not fully know or understand what she was signing.

47.    These tangible components of the System constitute "goods" within the meaning of Md. Code Ann., Com. Law § 2-105(1), and the transaction qualifies as a sale of goods under § 2-102. While the purported contract also involved installation services, the sale of goods was the dominant aspect of the transaction.

48.    Freedom Forever is a merchant with respect to the System and its related equipment under § 2-104(1) and thus is subject to the obligations and warranties imposed by Maryland's Commercial Law Article, Title 2.

49.    Under § 2-313, Freedom Forever made express warranties to Plaintiff, including:

- a 10-year workmanship warranty covering defects in installation;
- a 10-year roof warranty for penetrations made during System installation; and
- promises of System performance and energy savings, including a production guarantee.

50.    Under § 2-314, an implied warranty of merchantability attached to the goods sold. Freedom Forever warranted that the goods would:

- be fit for the ordinary purpose of generating electricity;
- conform to affirmations made on packaging or labels; and
- pass without objection in the trade.

51.    Under § 2-315, an implied warranty of fitness for a particular purpose also attached. Plaintiff made clear her purpose was to lower electricity costs. Freedom Forever, through its agent, selected and installed a System that Plaintiff relied upon as fit for that purpose.

52.    Throughout 2023 and into 2024, Plaintiff experienced significant and unexplained increases in electricity usage and utility costs. She repeatedly reported the

issue to Freedom Forever, raising concerns about possible electrical configuration or installation problems.

53.    Despite her complaints, Freedom Forever failed to conduct a timely inspection or make the necessary repairs. When a technician eventually visited, he identified a faulty inverter—a critical component. Yet Freedom Forever took no corrective action and continued to deny any responsibility.

54.    Freedom Forever's failure to inspect, repair, or honor its obligations constitutes a:

- breach of express warranty under § 2-313;
- breach of the implied warranty of merchantability under § 2-314; and
- breach of the implied warranty of fitness for a particular purpose under § 2-315.

11. As a direct and proximate result, Plaintiff suffered damages including:

- excessive energy bills;
- loss of expected System benefits; and
- emotional distress, inconvenience, and financial strain.

**WHEREFORE**, Plaintiff Elena Pereira requests judgment against Defendant Freedom Forever, LLC, and order an award for actual, statutory and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

### COUNT III: Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. (Incorporating Md. Code Ann., Com. Law §§ 2-313, 2-314, 2-315)

55.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

56.    The Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. § 2301 et seq.,

provides a federal cause of action for consumers who are harmed by a supplier, warrantor, or service contractor's failure to comply with the terms of a written or implied warranty.

57.    Defendant Freedom Forever is a "warrantor" and "supplier" within the meaning of 15 U.S.C. § 2301(4)-(5), and Plaintiff is a "consumer" as defined in § 2301(3).

58.    The System, including panels, inverter, and other hardware, constitutes a "consumer product" under § 2301(1).

59.    Freedom Forever issued a written warranty as defined in § 2301(6), including a:

- 10-year workmanship warranty for the installation;
- 10-year limited warranty on roofing penetrations; and
- performance guarantee regarding energy output.

60.    As described in Count Four, Freedom Forever breached its written and implied warranties as defined by the MMWA by:

- failing to inspect the system after reports of electrical or performance issues; and
- failing to ensure the System performed as warranted.

61.    These acts also constitute violations of the Maryland Commercial Law Article §§ 2-313, 2-314, and 2-315, which are incorporated by reference into the MMWA cause of action under 15 U.S.C. § 2301(d)(1).

62.    The Plaintiff suffered economic losses, diminished System performance, and was deprived of the benefit of her bargain.

**WHEREFORE,** Plaintiff Elena Pereira requests judgment against Defendant Freedom Forever, LLC, and order an award for actual, statutory and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

**Count IV: Violations of the Maryland Consumer Protection Act**
**Md. Code Ann. Com. Law §13-101, et seq. ("MCPA")**

63.     The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

64.     The Plaintiff is a "consumer" as defined in the MCPA.

65.     The transaction between Plaintiff and Defendant involves "consumer credit", "consumer goods", and "consumer services" as the MCPA defines those terms.

66.     The Defendant is a "person" and a "merchant," as those terms are defined in the MCPA.

67.     The Maryland legislature enacted the MCPA in response to a "mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit." Md. Code Ann., Com. Law § 13-102(a)(1).

68.     The practices of the Defendant are the practices that the MCPA addresses and for which the MCPA gives consumers an avenue of redress.

69.     Under the MCPA, such practices include false oral or written statements that have "the capacity, tendency, or effect of deceiving or misleading consumers." MCPA § 13–301(1).

70.     Under the MCPA, such practices include any "[f]ailure to state a material fact if the failure deceives or tends to deceive;" MCPA § 13–301(3).

71.     MCPA § 13-303(5) states, "A person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in (5) The collection of consumer debts."

72.     MCPA § 13-303(1) states, "A person may not engage in any unfair, abusive,

or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services."

73.     On or about July 13, 2022, Freedom Forever, acting through its agent, Thiego Freitas, solicited the Plaintiff at her home to sell her the System and related services, including a partial roof replacement and tree removal. Mr. Freitas also facilitated and arranged financing through a third-party lender as part of the transaction.

74.     Plaintiff is a 73-year-old senior citizen who lives on a fixed income and rents rooms in her home to make ends meet. At the time of the transaction, she informed Mr. Freitas that she does not regularly use email or computers.

75.     Despite this, the Defendant presented the Plaintiff with a series of electronic documents and directed her to sign them on his computer without clearly explaining their contents or providing any information to her in her native language. Plaintiff did not receive a copy of the loan documents or any of the related disclosures at the time of signing.

76.     Freedom Forever committed the following unfair and deceptive trade practices in violation of § 13-301 of the MCPA, including but not limited to:

   a.  False and Misleading Representations – § 13-301(1), (2), (3):

      1.  Misrepresented that Plaintiff was "signing up for solar" without clearly disclosing that she was executing a binding finance agreement with a 30-year loan.
      2.  Failed to disclose that the loan included substantial finance charges and interest.
      3.  Told Plaintiff that she would save money on electricity when, in fact, her utility bills increased significantly.
      4.  Misrepresented the scope of work covered by the Agreement, omitting costs for tree removal and other associated work.
      5.  Failed to disclose the existence, scope, or cost of financing.

6. Concealed the fact that Plaintiff would be bound to repay nearly $45,000, including interest.
7. Failed to inform Plaintiff of the System's energy production limitations and the impact of partial shading or inverter malfunction.
8. Failed to provide Plaintiff with any of the loan documents at the time of contracting.

b. Violation of Other Laws –

1. Violations of the Maryland Door-to-Door Sales Act, as described *infra*, which violates MCPA § 13-301(14)(iv):
2. Violations of the Maryland Consumer Debt Collection Act, as described *infra*, which violates MCPA § 13-301(14)(iii):
3. Violated the ESIGN Act, 15 U.S.C. § 7001, by failing to obtain informed consent for electronic documents.
4. Violated the MUETA, Md. Code Ann., Com. Law § 21-104, by failing to obtain affirmative consent and provide retainable copies.
5. Violated Md. Code Ann., Bus. Reg. § 8-501(c), by failing to include all contracted work in writing.
6. Violated Md. Code Ann., Bus. Reg. § 8-617, by accepting a deposit in excess of one-third of the total contract price before work commenced.

77. Plaintiff reasonably relied on the representations and omissions of Defendant and entered into the transaction believing it would reduce her energy costs, not substantially increase them.

78. As a result of Defendant's deceptive practices, Plaintiff suffered ascertainable losses, including:

- substantial debt and finance charges she did not knowingly incur;

- increased utility bills due to improper or ineffective System installation;

- the costs of tree removal and partial reroofing were not properly disclosed.

- emotional distress, frustration, and confusion associated with the unresponsive conduct of the Defendant.

79. The MCPA authorizes the Court to grant equitable relief, including rescission, restitution, and injunctive relief, and to award actual damages, attorney's fees,

and enhanced statutory damages for willful conduct under § 13-408.

**WHEREFORE,** Plaintiff Elena Pereira requests judgment against Defendant Freedom Forever, LLC, and order rescission of the Agreement, and order an award for actual, statutory and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

## COUNT V: Violation of the Maryland Consumer Debt Collection Act
## Md. Code Ann., Com. Law § 14-201 et seq.

80.     The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

81.     The Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201 et seq. prohibits collectors from using conduct that violates federal or state law in the collection of consumer debts.

82.     Plaintiff is a "consumer" under § 14-201(b), and the obligation at issue is a consumer debt.

83.     Defendant Freedom Forever is a "collector" under § 14-201(b) and (c), as it retained and accepted funds arising from the extension of consumer credit and has enforced or attempted to enforce the obligation despite Plaintiff's disputes and legal challenges.

84.     Freedom Forever arranged for the Plaintiff to enter into a loan for approximately $45,000 but failed to provide the Plaintiff with the loan documents.

85.     The initial loan disbursement of $16,428.78 exceeds the one-third deposit limit imposed by the Maryland Home Improvement Law, Md. Code Ann., Bus. Reg. § 8-617, which prohibits home improvement contractors from receiving or demanding more

than one-third of the contract price before beginning work.

86.    By knowingly accepting more than one-third of the contract price before commencing performance, Freedom Forever violated § 8-617, thereby rendering the contract partially unenforceable and the debt arising from it illegally procured.

87.    Freedom Forever has nonetheless:

- retained the improperly disbursed loan proceeds;
- denied any obligation to inspect or repair the defective System; and
- arranged for financing and denied responsibility for the loan, despite being the primary beneficiary and originator of the transaction.

88.    These acts constitute violations of § 14-202(8) of the MCDCA, which prohibits claiming, attempting, or threatening to enforce a right with knowledge that the right does not exist, or with reckless disregard as to the validity of the right.

89.    Freedom Forever also violated § 14-202(11) by engaging in conduct that violates the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., including:

- § 1692e(2)(a) by misrepresenting the character, amount, or legal status of any debt;
- § 1692e(2)(b) by misrepresenting any services rendered or compensation which may be lawfully received by the collector for the collection of a debt;
- § 1692e(2)(b) by using deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer; and
- § 1692f: by collecting any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

90.    Plaintiff has suffered damages as a result of this unlawful conduct, including economic loss and hardship, emotional distress, and threatened or actual damage to her credit reputation.

**WHEREFORE,** Plaintiff Elena Pereira requests judgment against Defendant Freedom Forever, LLC, and order an award for actual, statutory and consequential

damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

### Count VI: Violation of the Maryland Door-to-Door Sales Act ("MDDSA") Md. Code Ann., Com. Law § 14-301 et seq.

91.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

92.    The Maryland Door-to-Door Sales Act ("DDSA"), Md. Code Ann., Com. Law § 14-301 et seq., governs personal solicitations for the sale of goods or services conducted at a consumer's residence and mandates specific disclosures, notices, and cancellation rights.

93.    Freedom Forever, acting through its agent Thiego Freitas, conducted a door-to-door sales solicitation at Plaintiff's home on July 13, 2022, for the purpose of selling the System and related goods and services.

94.    The transaction resulted in the sale of goods and services exceeding $25 in value and was consummated at Plaintiff's home, within the meaning of § 14-301(b).

95.    Freedom Forever failed to comply with multiple mandatory provisions of the DDSA, including:

- failing to provide Plaintiff with a written Notice of Right to Cancel in accordance with § 14-302;
- failing to furnish a contract in a language understandable to the Plaintiff, who was not proficient with electronic documents and digital interfaces;
- failing to honor the mandatory 3-day cooling-off period, as required by § 14-303; and
- failing to clearly and conspicuously disclose Plaintiff's cancellation rights.

96.    The DDSA also prohibits retaining any portion of the contract amount or delivering goods or services until the rescission period has expired, unless waiver

conditions are met, which were not present here.

97.    Because of these violations, the contract was not enforceable during the rescission period, and Plaintiff retained her right to cancel the Agreement and void any related loan obligation.

98.    Freedom Forever's failure to comply with the DDSA renders the contract voidable and independently constitutes a violation of the Maryland Consumer Protection Act under § 13-301(14)(iii).

99.    As a result of Defendant's violations of the DDSA, Plaintiff has suffered damages, including:

- financial obligations under a voidable contract;
- denial of statutory rescission rights; and
- emotional distress, confusion, and frustration.

**WHEREFORE,** Plaintiff Elena Pereira requests judgment against Defendant Freedom Forever, LLC, and order an award for actual, statutory and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

## COUNT VII—Claim for Attorney's Fees Allowed by Law

100.    Under Rule 2-703(b), the Plaintiff includes this separately numbered claim for attorney's fees in this initial pleading. Further, under Rule 2-703(d), the Plaintiff advises the Court and the Defendant that she believes this case is likely to result in a substantial claim for attorneys' fees for services over a significant period.

Respectfully submitted:

By:     */s/ Derek A. Hills*
        Derek A. Hills, Esq.
        The Law Office of Derek A. Hills, LLC
        129 N. West St., Suite 1
        Easton, MD 21601
        Phone: 443-239-4626
        dhills@dahlawoffice.com
        AIS No. 1506160146

        and

        */s/ Peter A. Holland*
        Peter A. Holland
        The Holland Law Firm, P.C.
        914 Bay Ridge Road, Suite 230
        Annapolis, MD 21403
        Telephone: (410) 280-6133
        peter@hollandlawfirm.com
        AIS No. 9212160067

        *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury for all issues so triable.

        */s/ Derek A. Hills*
        Derek A. Hills, Esq.

Page 21 of 21



**(MD) Supply and Installation Agreement**
**Home Improvement Agreement**
(V6-042022)

43445 Business Park Drive Suite 110
Temecula, CA 92590

Freedom Forever Maryland, LLC
MHIC License #140496

## System Specifics

| System Size | System Warranty |
|---|---|
| 4.8 kW | 25 Years |

**The Freedom Forever Promise\***

We provide a money-back energy production guarantee.
We warrant all of our roofing work.
We warrant and repair the system (as defined below).
We fix or pay for any damage we may cause to your property.
We provide 24/7 web-enabled monitoring at no additional cost.
*\*Please refer to specific terms in your Supply and Installation Agreement*

**System Cost**

Total Contract Price: $32,857.55

Down Payment: $

Amount Due: $32,857.55

First Year Production (Estimate): 6799    kWh

This contract creates a mortgage or lien against your property to secure payment and may cause a loss of your property if you fail to pay the amount agreed upon. You have the right to consult an attorney. You have the right to rescind this contract within 5 business days after the date you sign it, or 7 business days if you are at least 65 years old, by notifying Freedom Forever in writing that you are rescinding the contract.

Date Signed by Customer/ Date of this Transaction:

7/13/2022 | 12:18 PM PDT

Customer's initials 

Customer #2's initials _____

Notices of Cancellation may be sent to this address:
Freedom Forever Maryland, LLC
43445 Business Park Drive Suite 110, Temecula, CA 92590

Freedom Forever is a licensed contractor in each state it
Operates in. For more information about our contractor licenses,
Please visit www.freedomforever.com/licenses

*Exhibit 1*

Each contractor and subcontractor must hold a current MHIC license, and anyone can ask MHIC about a contractor or a subcontractor. The correct address for MHIC is 500 North Calvert Street, Baltimore, Maryland 21202. The telephone numbers are 410-230-6309 and 1-888-218-5925. The website is https://www.dllr.state.md.us/license/mhic/.



| Homeowner ("Customer") | |
|---|---|
| Homeowner Name: Elena Pereira<br><br>Phone: (301) 741-7063 | Co-Homeowner Name (if applicable):<br><br>Phone: |

**Installation Address ("Property")**

4804 Olympia Avenue, Beltsville, MD 20705

| Total Installed System Price ("Contract Price") (including all finance charges)<br><br>$32,857.55 | Down Payment (not to exceed 1/3 of the Total Contract Price)<br><br>$<br><br>(Due on Effective Date) |
|---|---|

**Payment Schedule:**

Customer will make payments according to the following schedules (as applicable):

| Third-Party Financed Projects:<br><br>Payment due upon Completed Installation (as defined below): 32,857.55 _____ (100% of System cost) | Customer Self-Financed Projects:<br><br>Payment due upon signing this Agreement: $1,000.00<br><br>Payment due upon Completed Installation: 26,286.04 _____ (80% of System cost)<br><br>Payment due upon the Completed Installation passing final inspection: 5,571.51 _____ (Remaining balance) |
|---|---|

**Description of the System to be Installed ("System")**

| "Module Group" Panels:<br>Tesla 400W, Tesla 420W<br><br><br><br>Inverter(s) / Monitoring Equipment ("Inverter System"):<br>SolarEdge<br>SolarEdge<br>Mounting Type: Roof Mount | Additional Components \| Allowances \| Notes \| Variances:<br>Partial Re-Roof |
|---|---|

**Proposed Start and Completion Schedule:** The following schedule will be adhered to unless circumstances beyond Freedom Forever's control arise:

Proposed Start Date: Freedom Forever will begin the Work (as defined below) within 30 business days from the date of receiving all required permits, or the date the property is ready for installation, whichever comes later.

Completed Installation Date: The Work will be substantially completed approximately 30 days from the installation of the System.

[This Space Intentionally Left Blank]



| Signatures | | |
|---|---|---|
| **Independent Sales Representative** | **Customer** | **Customer #2 (if applicable)** |
| Sales Rep Signature: | Customer Signature: | Customer Signature: |
| DocuSigned by:<br>*Thiago Freitas*<br>ECAA3E89EF16468... | DocuSigned by:<br>*Elena Pereira*<br>F162003023C3430... | |
| Name: Thiago Freitas | Name: Elena Pereira | Name: |
| Phone: (240) 304-6376 | Date: 7/13/2022 \| 12:18 PM PDT | Date: |
| Date: 7/13/2022 \| 12:01 PM PDT | | |
| License No. 148025 | | |
| I hereby represent that this agreement was presented to the customer and that I obtained his/her signature to this agreement. | | |

- The Customer(s) are collectively referred to as the Customer.
- The Customer is entitled to a completed copy of this Agreement, signed by both Customer and Freedom Forever, before any work may be started.
- The Customer understands that in order to realize the benefit of the solar investment tax credit, Customer must have federal income tax liability that is at least equal to the value of the tax credit. Customer hereby acknowledges Customer has sought tax advice from a qualified tax professional and understands any tax benefits and burdens arising from this Agreement.
- The Maryland Home Improvement Commission ("MHIC") administers the Guaranty Fund, which may compensate homeowners for certain actual losses caused by acts or omissions of licensed contractors. Formal mediation of disputes between homeowners and contractors is available through the MHIC.
- This Agreement calls for binding arbitration of disputes between the Customer and Freedom Forever.  Please see EXHIBIT C for more information.
- A Customer has the right to request that a contractor purchase a performance bond for additional protection against losses not covered by the Guaranty Fund.
- The Customer may cancel this Agreement at any time, without penalty, prior to midnight of the fifth business day after the date the Customer receives a signed and dated copy of this Agreement, or the seventh business day if the Customer is at least 65 years old. Please see attached Notice of Cancellation form for more information.



**TERMS AND CONDITIONS**

### ARTICLE 1 PARTIES

This Supply and Installation Agreement (this "Agreement") is made and entered into as of the date of the last signature on the cover page hereof (the "Effective Date") by and between Freedom Forever Maryland, LLC, a Delaware limited liability company ("Freedom Forever") and the Customer ("Customer"). If the Customer is not the homeowner (the "Homeowner"), Customer shall provide Freedom Forever with written proof prior to the execution of this Agreement that the Homeowner consents to the System and the Work. Freedom Forever and the Customer are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties".

### ARTICLE 2 WORK

2.1   **Work.** Freedom Forever shall provide the Customer the following services at the address of <u>4804 Olympia Avenue,</u> (the "Property") on the terms set forth in this Agreement (the "Work"):   <u>Beltsville, MD 20705</u>

    a.  Install the System and its components as described on the cover page, which includes design, supply and installation of all photovoltaic panels, inverter(s), AC & DC disconnects, wiring, conduit and overcurrent protection, and racking placement.
    b.  Obtain necessary permits and submit necessary paperwork to receive permission to operate and/or interconnect with the electric utility provider.
        1.  Freedom Forever cannot promise or guarantee the date your electric utility provider will provide permission to operate. Customer may not turn on the system until the electric utility provider has given its permission to operate. Customer is liable for any costs and/or damage relating to premature activation of the system.
    c.  Provide all labor, material, equipment, supervision and delivery to furnish and install the entire System as specified under the terms of this Agreement.
    d.  Conduct related filling and compaction.
    e.  Coordinate building, electrical and utility inspections.
    f.  Start up and test the completed System.
    g.  Additional works described on page one.

2.2   **Exclusions.** Any alteration or deviation from the above specifications, including but not limited to any additional material and/or any labor costs incurred by such alteration or deviation, are not part of the Work, and shall only be executed pursuant to <u>ARTICLE 6</u> of this Agreement, with the costs solely borne by the Customer. These alteration and deviation include but are not limited to:

    a.  Upgrade of existing main service panels, sub-panels or switchboards (if necessary)
    b.  Upgrade, replacement or repair of existing roof, or supporting roof structure.
    c.  Tree removal, fencing, weed abatement, curbing, gravel or landscaping.
    d.  Non-standard groundwork (such as on difficult soil conditions).
    e.  Additional grading, rock/boulder removal, blasting, coring, soil testing, compaction for footings, and trenching.
    f.  Structural engineering calculations or analysis of existing structures.
    g.  Habitat studies, additional inspections or fees of any type.
    h.  Additional permitting requirements by local building authorities or jurisdictions, such as zoning, land use, architecture, planning, habitat, environmental, etc.
    i.  Additional exclusions described on page one of this Agreement, initialed by both Parties.

2.3   **Standard of Performance.** Freedom Forever shall perform all construction and related services provided hereunder in a good and workmanlike manner, in accordance with all requirements of the documents contained in this Agreement, and all applicable laws, codes, regulations and other requirements, including safety requirements.

### ARTICLE 3 PROPERTY

3.1   **Property.** Freedom Forever shall install the System on the Property. Within ten (10) days of the Effective Date, the Customer shall make the Property available to Freedom Forever for performance of the Work. The Customer or any inhabitants of the Property are not required to vacate the Property during the Work, however, the Customer agrees and understands that there may be loss of power to the Property during the Work, and Customer agrees to indemnify, defend, and hold harmless Freedom Forever for any damage or claims that may occur as a result of that loss of power. If the Customer is a Landlord, the Customer is solely responsible for providing any notice required by any lease to the tenant.

3.2   **Ownership, Owner Consent Right to Install and Agent Authority.** The Customer represents and warrants to Freedom Forever that all Homeowner(s) have consented to this Agreement, and/or the agent has the authority to sign this Agreement, that the Customer has the right to enter into this Agreement and to install the System on the Property.

3.3   **HOA Consent.** Customer warrants that they understand and assume all risks associated with obtaining permission from the HOA, Condominium Board or similar governing body (the "Board") to install the System. Customer waives any claim or defenses to this Agreement in the event the Board fails to approve installation of the System. Customer shall be responsible for fulfilling all obligations under this Agreement irrespective of Board approval.

                                    Customer #1: <u>EP</u>
                                      Customer #2: _____

3.4   **Site Inspection.** The Customer agrees to allow Freedom Forever and construction professionals (including engineer, architect, licensed contractors, or their representatives) (collectively "Subcontractors") hired by Freedom Forever to access the Property to inspect any buildings and roofs prior to the installation of the System to ensure that the Property can accommodate the System. Notice shall be required twenty-



four (24) hours in advance and access shall be reasonably granted by Customer thereafter.

3.5   **Access Rights.** The Customer grants to Freedom Forever and the Subcontractors the right to access all of the Property for the purposes of (a) designing, installing, constructing, testing, operating, maintaining, repairing and replacing the System or making any additions to the System or installing complementary technologies on or about the location of the System, and performing Freedom Forever's obligations under this Agreement; (b) installing, testing and maintaining electric lines and inverters and meters, necessary to interconnect the System to the Customer's electric system at the Property and/or to the utility's electric distribution system; (c) taking any other action reasonably necessary in connection with designing, installing, constructing, testing, operating, maintaining, repairing and replacing the System; or (d) repair of any damage to roof, wall or any part of the property determined by Freedom Forever to be caused by the installation of the System. This access right shall continue for up to ninety (90) days after the later of the termination of this Agreement or the expiration of the Production Guarantee Term (as defined in <u>EXHIBIT A</u>), if applicable, and per the below requirements:

    a.   **Reasonable Notice.** Freedom Forever shall provide the Customer with twenty-four (24) hours' notice of its need to access the Property whenever reasonable and when not in the case of emergency.

    b.   **No Interference.** During the time that Freedom Forever has access rights the Customer shall ensure that Freedom Forever's access rights are preserved and shall not interfere with or permit any third party to interfere with such rights or access.

    c.   **Prevention of Access.** Any act, negligence or omission of the Customer, its representative or by any third party that prevents or delays Freedom Forever from performing its obligations under this Agreement shall not be counted against the time of performance set in this Agreement. Freedom Forever shall not be responsible for any resulting loss or damage from such delay.

    d.   **Personal Property/ Assumption of Risk.** Customer acknowledges that the System installation site is a construction zone and that any property (e.g. vehicles, pets, livestock, etc.) left in and around the site during the installation process may run the risk of injury, harm, or loss. As such, prior to Commencement (as defined below) and for the duration that Work is being performed, Customer agrees to be responsible for removing all personal property and effects, including but not limited to, any Customer vehicles, out of the installation site and surrounding areas. Customer hereby agrees to assume all risk and loss to any property not so removed while Work is being performed.

3.6   **Removal of Hazardous Materials.** The Customer agrees to provide a safe and secure work environment at the Property during the term of this Agreement. The Customer shall be responsible for removal and any costs incurred for the removal of hazardous materials, including asbestos, PCBs, petroleum, or hazardous waste material uncovered or revealed at the Property. If any hazardous materials are discovered, Freedom Forever may immediately cease all the Work in connection with such hazardous condition(s) in any affected area(s). Freedom Forever shall not be required to resume the Work until the Customer delivers written proof of all required local building authority permits related to: (i) specifying that such condition(s) and all affected area(s) have been rendered safe by the building authorities for the resumption of the Work, or (ii) specifying any special conditions under which the Work may resume safely. Any work stoppage due to unavailability of the Property due to the discovery and removal of hazardous materials does not relieve the Customer's obligation to fulfill this Agreement, and any completion dates.

3.7   **Existing Conditions.** Freedom Forever is not responsible for and bears no liability for the performance of existing electrical equipment at the Property, including but not limited to the main electrical service panel, any major electrical devices, and/or any other similar devices.

**ARTICLE 4 - PAYMENT.**

4.1   **Price.** In consideration of performance of the Work and installation of the System, the Customer shall pay to Freedom Forever the Total Contract Price, as defined on page one of this Agreement. The Total Contract Price shall be paid in full upon Completed Installation.

4.2   **Payment.** Customer agrees to pay the Total Contract Price as set forth on page one of this Agreement plus all applicable taxes. Customer may choose to finance the Total Contract Price by entering into a financing agreement with a third party. If Customer chooses to enter into an arrangement with a third party for financing of the Total Contract Price, Customer understands that Customer is directly contracting with a third-party financing company and not Freedom Forever for financing services. Customer will remain obligated for the full Total Contract Price until full payment is received by Freedom Forever.

4.3   **Down Payment.** Upon the Effective Date, the Customer shall pay to Freedom Forever a Down Payment (not to exceed 1/3 of the Total Contract Price) in an amount provided on page one of this Agreement to Freedom Forever. Freedom Forever agrees to refund the full amount of the Down Payment if the Customer cancels the Agreement within five (5) business days following the Effective Date, or within seven (7) business days if the Customer is at least 65 years old. Any cancellation after five (5) business days following the Effective Date, or seven (7) business days following the Effective Date if the Customer is at least 65 years old, will cause a forfeiture of the Down Payment. If neither Party cancels the Agreement, the Down Payment shall be applied to the Total Contract Price. This ARTICLE 4.3 does not apply if the Down Payment as provided on page one of this Agreement is zero ($0).

4.4   **Past Due Amount.** Past due amounts shall accrue interest from the date such amounts were due until the date paid at an interest rate equal to the lesser of twelve percent (12%) per annum or the maximum rate permitted by law.

4.5   **Financing Payments.** If Customer is financing the System, the timing and amount of the payments (and any applicable interest accrued) will be subject to the terms and conditions of the financing agreement with the finance company (the "Finance Company"). Any agreement between the Customer with regard to financing shall be solely between the Customer and the Finance Company.

4.6   **Incentives.** Depending on the state and/or utility district in which Customer resides, Customer may be eligible for state and local incentives and/or rebates. The incentive and/or rebate calculations provided to Customer are estimates. Those estimates are based on certain assumptions that may not be applicable based on the circumstances specific to the Work. However, actual incentives and/or rebates are variable as are eligibility requirements, funding availability and rates which may change. In an effort to assist Customer in capturing any applicable incentive and/or rebate, Freedom Forever will use good faith and reasonable efforts to help Customer to secure applicable incentives and/or rebates, but Freedom Forever shall have no financial obligation to the Customer regarding actual incentive and/or rebate amounts received. Customer agrees to pay the Total Contract Price in full regardless of the actual amount of any incentive and/or rebates



Customer may or may not receive. Customer agrees to provide all necessary assistance to Freedom Forever to capture an incentive and/or rebate including but not limited to requested documentation and signatures on additional paperwork. Customer is responsible for any taxes and/or assessments required by federal, state or local governments or related regulatory agencies or utilities.

4.7   **Taxes.** Customer is responsible for all taxes related to the System and this Agreement, including taxes assessed on or arising from purchase, installation, ownership of the System, including all sales (which may be included as part of the Total Contract Price), use, and personal property taxes and real property taxes associated with the Property.

4.8   **Credit Card Payments.** If Customer chooses to pay any amount due under this Agreement with a credit card, Customer shall be responsible for all related fees and/or charges pertaining to such transaction ("Credit Card Fee(s)"). Credit Card Fees shall be calculated at two and nine tenth percent (2.9%) of Customer's credit card transaction, plus twenty-five cents ($0.25) per transaction.

## ARTICLE 5 - TIME FOR PERFORMANCE: TITLE OF WORK

5.1   **Commencement.** Freedom Forever shall commence performance of the Work at the Property ("Commencement") within thirty (30) business days from the date of receiving all required permits, or the date the Property is ready for installation, whichever comes later. Following Commencement Freedom Forever shall diligently proceed to achieve Completed Installation.

5.2   **Completed Installation.** "Completed Installation" means the System is fully installed and is ready for start-up and testing.

5.3   **Guaranteed Completion Date.** Except as otherwise provided herein, Freedom Forever shall achieve Completed Installation within sixty (60) days from Commencement (the "Guaranteed Completion Date").

5.4   **Extension.** Freedom Forever retains the sole and exclusive right to modify the Commencement and Guaranteed Completion Date due to Force Majeure Events, Customer-Caused Delay, and other circumstances that are beyond the control of Freedom Forever, including but not limited to:

a. Product delivery time constraints by manufacturer(s);
b. Availability of the Customer's selected equipment;
c. Completion of the Customer's financing;
d. Permit process;
e. HOA's and/or Condominium Board's approval process;
f. Weather conditions;
g. Disease, pandemics and/or quarantines;
h. Acts of government; or
i. The Work hereunder includes any of the following: roof work, main panel upgrades, or ground mount(s).

Delays caused by such events do not constitute abandonment and are not included in calculating timeframes for payment or performance.

5.5   **Title of System.** Prior to Completed Installation, Freedom Forever has good title to all the System Assets (the "System Assets"). The System Assets mean all the Work and all materials delivered to the Property, whether or not actually incorporated in the System or the Property. Upon the Customer's payment of the Total Contract Price, legal title and ownership of the System shall pass to the Customer.

## ARTICLE 6 - CHANGED CONDITIONS

6.1   **Right to Cancel.**

a. **Site Inspection Result.** After site inspection by Freedom Forever as set forth in ARTICLE 3.4, Freedom Forever may cancel this Agreement and propose a new agreement (the "New Agreement"), based on the site inspection result at Freedom Forever's sole discretion.
b. **New Conditions.** In the event that Freedom Forever discovers new conditions of the Property which were not discovered or revealed before the Effective Date, or in the event that environmental concerns unexpectedly arise and require involvement and/or further permits from local building authorities, Freedom Forever shall have the right to cancel this Agreement and propose a New Agreement.
c. **Customer's Right to Cancel.** If Freedom Forever elects to cancel this Agreement and propose a New Agreement, Customer shall have the right to accept or reject the New Agreement. Until such New Agreement is executed by all Parties and the Five (5) Day Right to Cancel, or Seven (7) Day Right to Cancel if the Customer is at least 65 years old, has passed, all Work shall cease. In the event the Customer decides not to proceed with the Work under the New Agreement, the Customer is solely responsible for paying for any Work performed under this Agreement, and the removal and repair of the Property to substantially the same condition as it was prior to the Work being performed.

6.2   **Extra Work and Change Orders.** Extra Work and Change Orders become part of this Agreement once the order is prepared in writing and signed by the Parties prior to the commencement of work covered by the new Change Order. The Change Order must describe the scope of extra work or change, the cost to be added or subtracted from the contract, and the effect the order will have on the schedule of progress payments. Change Orders shall be executed using the Change Order Form in EXHIBIT B.

6.3   **Discretionary Design Changes.** To the extent permissible by law, Freedom Forever may design the System to incorporate any panels from the Module Group OR redesign the System at any time prior to or after installation, to (i) replace such System equipment with those from a different manufacturer, inclusive of differences in type, model, or wattage, without limitation; (ii) increase the size of the System in its sole discretion; and/or (iii) modify the location of the installation of the System on the roof or ground mounts at the Property without a Change Order. Any replacement of System equipment proposed without a Change Order shall be of equal or greater production to be deemed a reasonably equivalent substitute.

Customer #1: _EP_

Customer #2: _____

**6 | Page**



## ARTICLE 7 – LIMITED WARRANTY

7.1 **Free of Material, Construction and Workmanship Defect.** Subject to the limitations and other provisions of this Agreement, Freedom Forever warrants that the Work and the System will be free from defects in material, construction and workmanship ten (10) years following the Completed Installation (the "Limited Warranty"). Freedom Forever warrants the roof of the Property against damage and water infiltration at each roofing penetration made by Freedom Forever in connection with the installation of the System (the "Covered Roof Area"); provided however that such roof penetration warranty shall be void and voidable if work is performed by Customer or Customer's contractors on the roof during the ten (10) year period. **This is not a warranty of the entire roof.** If the roof has an existing warranty, Customer has the sole responsibility of confirming with the roofing contractor who performed the work that the installation of the System will not void any warranty. If the Work will void any existing roof warranty, the Customer proceeds knowing that this is the case. Any claim under the Limited Warranty must be made before the expiration of the Limited Warranty.

7.2 **Warranty Exclusion.** The Limited Warranty excludes products not manufactured by Freedom Forever. The Customer shall be entitled to all warranties, if any, provided by the manufacturers of the components, accessories and equipment that are not manufactured by Freedom Forever, but which Freedom Forever installs. These items generally include, but are not limited to, solar panels, inverters, and disconnect switches. Freedom Forever does not expressly warrant these items because it is not involved in the manufacturing process. Occasionally, a component, accessory or item of equipment will be unavailable for reasons beyond Freedom Forever's control. If this should occur, Freedom Forever shall have the right to substitute a reasonably equivalent item. The Limited Warranty excludes any measuring or monitoring equipment or service.

7.3 **Other Exclusions.** The Limited Warranty does not extend to (a) normal wear and tear; or (b) damage or failure caused by (i) abuse or material neglect by the Customer, unless such action or inaction was taken or not taken, as the case may be, in reliance on and in compliance with written instructions provided by Freedom Forever, (ii) modifications not performed by or through Freedom Forever or an affiliate of Freedom Forever or in a manner materially inconsistent with or contrary to the written information or written instructions provided by Freedom Forever or contained in the vendor manuals provided by Freedom Forever, (iii) the negligent acts or omissions of the Customer or the Customer's separate contractors, (iv) defects or deficiencies attributable to Force Majeure Events, (v) failure by the Customer to properly maintain or operate the System, or (vi) defects caused by the failure of the structural integrity of the support system by reason of any earth or fill ground movement.

7.4 **Repair and Replacement.** If the Customer discovers a breach of the Limited Warranty and makes a timely claim, then, as the Customer's sole and exclusive remedy, Freedom Forever shall repair or replace the defective Work. Freedom Forever shall commence and complete such repairs or replacements within a reasonable time after receipt of the Customer's notice of warranty claim. If a failure cannot be corrected by Freedom Forever's reasonable efforts, the Parties will negotiate an equitable solution in good faith.

7.5 **Disputes of Breach of Warranty.** If Freedom Forever disputes whether a breach of warranty has occurred, any tests of the System shall be as mutually agreed, and Freedom Forever shall be notified prior to such testing and may be present at all tests that may be performed.

7.6 **Reservation of Right to Access for Limited Warranty.** Freedom Forever reserves the right to access the Property, after reasonable notice to the Customer, to repair, inspect or assess the performance of the Customer's System.

7.7 **Exclusive Remedy.** The Limited Warranty is the exclusive remedy for defects in material and workmanship provided under this Agreement, and is provided in lieu of all other warranties, express or implied. On expiration of the Limited Warranty, all liability of Freedom Forever for breach of warranty shall terminate.

**EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, FREEDOM FOREVER MAKES NO REPRESENTATIONS AND GRANTS NO WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, UNDER THIS AGREEMENT, AND FREEDOM FOREVER SPECIFICALLY DISCLAIMS ANY OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, OR EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE.**

7.8 **Transferability of Warranty.** The Limited Warranty that the Work and the System will be free from defects in material, construction and workmanship in ten (10) years following the Completed Installation is transferable when the Customer conveys or transfers the Property to another party. The Customer or the transferee must give notice, in writing, to Freedom Forever within twenty (20) days from the effective date of the conveyance or transfer. The transfer of warranty shall be effective only if the transferee agrees to be bound by the conditions and terms of this Agreement. The transfer of warranty shall be effective upon Freedom Forever's receipt of the written notice from transferee agreeing to the terms and conditions of this Agreement.

## ARTICLE 8 – SYSTEM PRODUCTION

8.1 Freedom Forever will provide the Customer a production guarantee, as set forth in <u>EXHIBIT A</u>.

## ARTICLE 9 – FORCE MAJEURE EVENTS; CUSTOMER-CAUSED DELAY

9.1 **Force Majeure.** For purposes of this Agreement, the term "Force Majeure Event" shall mean any event, condition or circumstance that delays or prevents a Party from timely performance of obligations under this Agreement, or from complying with conditions required under this Agreement if such act or event, condition or circumstance, despite the exercise of reasonable efforts, cannot be avoided by, and is beyond the reasonable control of and without the fault or negligence of, the Party relying thereon as justification for such delay, nonperformance, or noncompliance, which includes, to the extent that the foregoing conditions are satisfied, war, sabotage, riots, insurrection, civil unrest or disturbance, military or guerilla action, terrorism, economic sanction or embargo, civil strike, work stoppage, slow-down, or lock-out; inclement weather, earthquake, abnormal weather condition or actions of the elements, hurricane, flood, lightning, wind, drought, volcanic eruption, Acts of God; unavailability of materials acceptable to Freedom Forever, fires, explosions, strikes, concurrent construction at Property affecting solar installation, government prohibitions, action or inaction of government or local utility, disease, pandemics, quarantines, or acts or omissions of other persons.



9.2    Customer-Caused Delay. For purposes of this Agreement, "Customer-Caused Delay" means delays caused by the Customer's failure to comply with the Customer's obligations under this Agreement, and any other delays caused by the Customer, the Customer's agents, or separate subcontractors.

9.3    Performance Excuse. On account of any ongoing Force Majeure Event, each Party shall be excused from performance of its obligations under this Agreement, other than payment obligations. Freedom Forever shall have the right to cancel this Agreement upon the occurrence of any Force Majeure Event or Customer-Caused Delay impacting the performance of the Work.

### ARTICLE 10. DEFAULT; TERMINATION

10.1   Default by Freedom Forever. Freedom Forever will be in default under this Agreement if any of the following occurs:

    a.  failure to perform its obligations under this Agreement which remains uncured for thirty (30) days after receipt of notice of default (the "Notice of Default") which shall be sent in writing to Freedom Forever by tracked postal or courier service; however, in the event such cure requires more than thirty (30) days to cure, Freedom Forever shall not be in default provided that Freedom Forever commences to cure during the original thirty (30) day cure period and diligently continues to cure until completion; or
    b.  Freedom Forever admits in writing its insolvency, files or there is filed against it a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent or undertakes or experiences any substantially similar activity.

10.2   Remedies in Case of Default by Freedom Forever. If Freedom Forever is in default under this Agreement, the Customer may:

    a.  terminate this Agreement; and/or
    b.  pursue any other remedy available to the Customer in this Agreement or by law.

10.3   Default by Customer. The Customer will be in default under this Agreement if any one of the following occurs:

    a.  the Customer fails to make any payment when it is due and such failure continues for a period of five (5) days.
    b.  the Customer fails to perform any material obligation that the Customer has undertaken in this Agreement (which includes doing something the Customer has agreed not to do, like alter the System) and such failure continues for a period of thirty (30) days after written notice.
    c.  the Customer has provided any false or misleading financial or other information to obtain this Agreement.
    d.  the Customer assigns, transfers, encumbers, sublets this Agreement or any part of the System without Freedom Forever's prior written consent, except as provided in ARTICLE 7.8 above.
    e.  the Customer makes an assignment for the benefit of creditors, admits in writing its insolvency, files or there is filed against the Customer a voluntary petition in bankruptcy, are adjudicated bankrupt or insolvent or undertakes or experiences any substantially similar activity.
    f.  the Customer conceals or fails to disclose known unpermitted structures on the Property.
    g.  the Customer willfully refused to obtain proper permits for discovered unpermitted structure.
    h.  any act or omission by Customer which interferes and/or prevents Freedom Forever from performing and/or completing the Work including, but not limited to, preventing Freedom Forever from installing equipment, failure to obtain Board permission for the Work, or refusing to sign documents necessary to achieve permitting and/or interconnection.

10.4   Remedies in Case of Default by Customer. If the Customer is in default under this Agreement, Freedom Forever may take any one or more of the following actions. If the law requires Freedom Forever to do so, Freedom Forever will give the Customer notice and wait any period of time required before taking any of these actions. Freedom Forever may:

    a.  terminate this Agreement without terminating payment obligations hereunder.
    b.  suspend the performance of this Agreement until an applicable cure period has ended.
    c.  take any reasonable action to correct the Customer's default or to prevent Freedom Forever's loss; any amount Freedom Forever pays will be added to the amount the Customer owes Freedom Forever and will be immediately due.
    d.  require the Customer, at the Customer's expense, to return the System or promptly make it available to Freedom Forever for recapture in a reasonable manner.
    e.  proceed, by appropriate court action, to enforce performance of this Agreement and to recover damages for the Customer's breach including costs and attorneys' fees.
    f.  disconnect, turn off or take back the System by legal process or self-help, but Freedom Forever may not disturb the peace or violate the law.
    g.  report the non-operational status of the System to the Customer's utility informing them that the Customer is no longer net metering.
    h.  charge the Customer a reasonable reconnection fee for reconnecting the System to the Customer's utility or turning the Customer's System back on after Freedom Forever disconnects or turns off the System due to the Customer's default.
    i.  recover from the Customer (A) all unpaid Total Contract Price amounts, taxes, and all or any other sums then due and owing, and (B) seek a pre or post judgment lien or similar security interest on or against the Customer's home.
    j.  recover from the Customer all direct and indirect, internal and external expenses incurred in partial completion of the Work, plus the lesser of fifteen percent (15%) profit thereon or the maximum percentage of profit permitted by applicable law.
    k.  pursue any other remedy available to Freedom Forever in this Agreement or by law or in equity.

10.5   Multiple Remedies. By choosing any one or more of these remedies, Freedom Forever does not give up its right to use another remedy. By deciding not to use any remedy should this Agreement be in default, Freedom Forever does not give up the right to use that remedy in case of a subsequent default.

10.6   Reimbursement. The Customer agrees to repay Freedom Forever for any reasonable amounts we pay to correct or cover the Customer's default. The Customer also agrees to reimburse Freedom Forever for any direct and indirect, internal and external costs and expenses Freedom Forever incurs, plus the lesser of fifteen percent (15%) profit thereon or the maximum percentage of profit permitted by applicable law, relating to the System's return resulting from early termination.



10.7  **Non-Default Terminations.** If any of the following events arise, either Party may terminate this Agreement without further liabilities or obligations on either party: (a) issuance of an order of a court or other public authority having jurisdiction which requires all the Work to be stopped; or (b) Force Majeure Event that lasts more than three hundred sixty-five (365) days. Freedom Forever may terminate this Agreement if there is a failure to obtain all permits and governmental approvals required for performance of the Work.

## ARTICLE 11 – INDEMNITY

11.1  To the fullest extent permitted by law, Customer shall indemnify, defend and hold harmless Freedom Forever from and against any and all loss, damage, expense and liability, including fines, penalties, court costs and reasonable attorneys' fees (collectively, "Liabilities") incurred by Freedom Forever in connection with or arising from any third-party claim for physical or other damage to or physical destruction of property or death of or bodily injury to any person to the extent caused by (a) any breach or violation of or default under this Agreement or any applicable legal requirements by Customer; or (b) any willful misconduct or gross negligent acts or omissions of Customer or its agents, contractors, subcontractors or others under Customer's control.

## ARTICLE 12 – LIMITATIONS OF LIABILITY

12.1  **Limitation of Liability.** Freedom Forever's total liability to the Customer, from any and all causes (including all claims under the warranties described in this Agreement), whether based on contract, tort (including negligence), strict liability or any other cause of action, shall in no event exceed the Total Contract Price. NOTWITHSTANDING ANY OF THE FOREGOING, FREEDOM FOREVER SHALL NOT BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES, OR LOST PROFITS.

## ARTICLE 13 – MARKETING AND CUSTOMER CONTACT

13.1  **Signage.** Customer agrees to allow a Freedom Forever marketing sign to be displayed at the Property beginning during the first day of Work and for one (1) month after Work is completed.

13.2  **Publicity.** Customer agrees and hereby authorizes Freedom Forever's use of Customer's voice, photographs, videos and likeness in print media, radio, television, e-mail, social media, web materials, and any audio and/or video recording. Customer agrees to authorize Freedom Forever's use of the Property's photographs and videos in print media, radio, television, e-mail, social media, web materials and any audio and/or video recording.

13.3  **Autodialed Telephone Calls and Text Messages.** Customer hereby knowingly or voluntarily consents to receive autodialed telephone calls and SMS text messages from Freedom Forever and its affiliates, contractors, or on our behalf at the mobile telephone number provided herein. These telephone calls and SMS text messages may include promotional material related to our services or others' products and services, which may be sent using an automatic telephone dialing system. Customer understands that there is no requirement to agree to receive telephone calls and/or SMS text messages as a condition of entering into this Agreement. Standard call and text message charges may apply.

## ARTICLE 14 – GENERAL PROVISIONS

14.1  **Governing Law.** This Agreement is governed by the laws where the Property is located.

14.2  **Notices.** All notices given by either Party hereunder must be in writing and delivered by personal delivery, certified mail (return receipt requested), or overnight courier. A notice shall be deemed received upon personal delivery, the promised delivery date after deposit with a reputable overnight courier, or five (5) days after deposit in the mail. Notices to either Party shall be sent to the respective address provided on the cover page or other address as provided in writing.

14.3  **Electronic Records.** Customer may be entitled by law to receive certain information "in writing". However, Customer agrees that all information, documents, disclosures, notices, and agreements between Customer and Freedom Forever may be in electronic form (collectively, "Electronic Record(s)"). Customer further agrees that Freedom Forever may use and obtain electronic signatures (such as by clicking, checking, or signing using a digital pen) in the processing of Electronic Records. Freedom Forever will provide the Electronic Records by emailing them at the most recent e-mail address provided by Customer that Freedom Forever has on file and/or by making the Electronic Records available via a website address. Customer must notify Freedom Forever of any change in e-mail address(es). If Freedom Forever sends an Electronic Record, but Customer does not receive it because the most recent e-mail address that Freedom Forever has on file is incorrect, out of date, blocked by a service provider, filtered by a service provider as "spam" or "junk mail", or Customer is otherwise unable to receive the Electronic Record, Freedom Forever will be deemed to have provided the Electronic Record to Customer. Customer must have a computer with an internet connection, a compatible web browser, Adobe Acrobat Reader version 8.0 or above; and a valid and accessible e-mail account. Customer may request a paper copy of any Electronic Record, and Freedom Forever will send a paper copy via U.S. mail within ninety (90) days.

14.4  **Data.** Freedom Forever may collect and store: nonpublic personal information about Customer, the System, energy usage, Customer credit report(s), and other related information; and may install, operate, and maintain a device on the Property that Freedom Forever may use to collect and store information about energy use and related information (collectively, "Data"). Freedom Forever may use any software related to operation of the System. Freedom Forever may use Data and access software to measure performance of the System. Customer agrees that Freedom Forever may use, store, and disclose the Data to our assignees, affiliates, actual or prospective lenders, financing parties, investors, insurers, acquirers, along with equipment manufacturers and suppliers associated with the System. Customer agrees that Freedom Forever may share the Data, including, without limitation, Customer's name, contact information, Property location, and other information Freedom Forever has collected or obtained about Customer with our affiliates and the Board if necessary. Freedom Forever's collection and processing of this Data is necessary for its legitimate interests, namely: the performance of a contract and to ensure the proper performance of the System; effectively communicating, responding, and resolving the queries and issues of Customer and Freedom Forever affiliates; and to administer, improve, and develop Freedom Forever's existing and new services and business.

14.5  Intentionally left blank.

freedom
FOREVER

14.6 **Dispute Forum.** All claims, disputes, and other matters in question between the Parties to this Agreement, arising out of or relating to this Agreement, or the alleged breach thereof, shall be brought and maintained in the state courts of the State of Maryland.

14.7 **Class Waiver.** Unless prohibited by applicable law, you, as Customer, agree to bring all claims against Freedom Forever, parent(s), subsidiaries, affiliates only in your individual capacity and YOU, AS CUSTOMER, ARE WAIVING THE RIGHT TO INITIATE OR PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.

14.8 **Survival.** Subject to the limitations and other provisions of this Agreement, EXHIBIT A, ARTICLE 11, ARTICLE 12, and ARTICLE 14, as well as any other provision that, in order to give proper effect to its intent, shall survive the expiration or earlier termination of this Agreement.

14.9 **Our Licenses.** Freedom Forever Maryland, LLC is a licensed contractor in Maryland. For information about contractor licensing requirements, contact the applicable county and/or city. For general information about our licenses please visit http://www.freedomforever.com/licenses.

14.10 **Release of Lien Claim.** Upon satisfactory payment being made for the work performed, Freedom Forever, prior to any further payment being made, shall furnish to the person contracting for the home improvement an unconditional release from any potential lien claimant claim or mechanic's lien authorized pursuant to Maryland Real Property Code Sections 9-101, et. Seq for that portion of the work for which payment has been made.

14.11 **Notice About General Liability Insurance.** Freedom Forever carries general liability insurance with Ironshore Specialty Insurance Company. Customer may contact the insurance provider at (877) 476-6411 to check Freedom Forever's insurance coverage.

14.12 **Notice About Workers Compensation Insurance.** Freedom Forever carries workers' compensation insurance with Berkshire Hathaway Homestate Companies for all its employees. Customer may contact the insurance provider at (888) 495-8949 to check Freedom Forever's coverage.

14.13 **Assignment.** Except as provided in ARTICLE 7.8 above, neither Party may assign any of its rights hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the forgoing, Freedom Forever may, without consent of Customer, assign this Agreement to an affiliate of Freedom Forever. Any purported assignment in violation of this ARTICLE 14.13 shall be null and void.

14.14 **Heirs, Successors and Assigns.** The terms of this Agreement shall be binding upon the Parties hereto and their respective heirs, successors, assigns and legal representatives.

14.15 **Right to Subcontract.** Freedom Forever shall have the right to subcontract the performance of the Work and any other duties or obligations under this Agreement to a third party (a "Subcontractor"). In all cases, Freedom Forever shall be responsible and liable for the acts and omissions of each Subcontractor to the same extent as if such acts or omissions were by Freedom Forever or its employees and shall be responsible for all fees and expenses payable to any Subcontractor.

14.16 **Waiver.** No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

14.17 **Add On / Combined System Waiver.** In the event the Customer has an existing, non-Freedom Forever installed solar energy system ("Existing System") on the Property and Customer desires to add on and combine the Existing System with a new System installed by Freedom Forever, Customer acknowledges and accepts the following:

    a. Customer assumes the risk of waiving any existing warranty for the Existing System.
    b. If the Existing System does not function properly due to the Work and addition of the new System, Customer assumes all such risk, loss and/or damages related to the Existing System. Customer assumes all risk and liability for any injury to Freedom Forever's subcontractors and its employees due to combining the Existing System and the new System.
    c. Customer understands that Freedom Forever's Production Guarantee does not apply to the Existing System.

14.18 **Amendment and Modification.** Except as covered under ARTICLE 6.2, this Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.

14.19 **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

14.20 **Severability.** If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to affect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

14.21 **Further Documents.** Customer agrees to execute any further documents as may be necessary to allow Freedom Forever to perform under this Agreement.



14.22 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

14.23 **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties as to the subject matter hereof, and the Parties are not bound by any oral expression or representation by any agent of either Party purporting to act for or on behalf of either Party or by any commitment or arrangement

14.24 not specified in this Agreement. Any plans, specifications, and other data furnished with or in connection with this Agreement are descriptive of the specifications and terms and conditions contained herein, and in case of conflict between the provisions stated in the plans and specifications or other data, and the terms of this Agreement, the terms of this Agreement shall prevail.

By signing below, Customer accepts Freedom Forever's Terms and Conditions.

| Customer | Customer #2 (If applicable) | Freedom Forever Maryland, LLC |
|---|---|---|
| Customer Signature: | Customer Signature: | /s/ Greg Albright |
| *Elena Pereira* (DocuSigned) | | TITLE: President |
| NAME: Elena Pereira | NAME: | NAME: Greg Albright |
| DATE: 7/13/2022 \| 12:18 PM PDT | DATE: | DATE: 7/13/2022 \| 12:18 PM PDT |



**LIST OF DOCUMENTS INCORPORATED INTO THIS AGREEMENT**

**Documents Incorporated in this Agreement:**

1. Notice of Right to Cancel
2. Notice of Cancellation (Freedom Forever Copy)
3. Notice of Cancellation (Customer Copy)
4. Production Guarantee (EXHIBIT A)
5. Change Order Form (EXHIBIT B)



**CUSTOMER RECEIPT OF:**
**NOTICE OF RIGHT TO CANCEL**

You, the Customer, have the right to cancel this Agreement within five (5) business days or seven (7) business days if you are at least 65 years old. You may cancel by e-mailing, mailing, faxing, or delivering a written notice to Freedom Forever at Freedom Forever's place of business by midnight of the fifth business day (seven if at last 65 years old) after you received a signed and dated copy of the Agreement that includes this notice. Include your name, your address, and the date you received the signed copy of the contract and this notice.

If you cancel, Freedom Forever must return to you any amount paid by you prior to cancellation within ten (10) days of receiving the notice of cancellation. For your part, you must make available to Freedom Forever at your residence, in substantially as good condition as you received them, goods delivered to you under this contract of sale. Or, you may, if you wish, comply with Freedom Forever's instructions on how to return the goods at Freedom Forever's expense and risk. If you do make the goods available to Freedom Forever and Freedom Forever does not pick them up within twenty (20) days of the date of your notice of cancellation, you may keep them without any further obligation to pay for them. If you fail to make the goods available to Freedom Forever, or if you agree to return the goods to Freedom Forever and fail to do so, then you remain liable for performance of all obligations under the contract. You have a duty to take reasonable care of the goods in your possession before cancellation or revocation and for a reasonable time thereafter, during which time the goods are otherwise at Freedom Forever's risk. If Freedom Forever has performed any services pursuant to this Agreement prior to its cancellation, Freedom Forever is entitled to no compensation.

BY SIGNING BELOW, I ACKNOWLEDGE THAT I RECEIVED THE ABOVE "NOTICE OF RIGHT TO CANCEL."

| **CUSTOMER** | **CUSTOMER #2 (IF APPLICABLE)** |
|---|---|
| CUSTOMER SIGNATURE: | CUSTOMER SIGNATURE: |
| *Elena Pereira* | |
| NAME: Elena Pereira | NAME: |
| DATE: 7/13/2022 | 12:18 PM PDT | DATE: |



**NOTICE OF CANCELLATION**
(Freedom Forever Copy)

<u>7/13/2022 | 12:18 PM PDT</u>    (Date of Transaction)

Customer may cancel this transaction, without any penalty or obligation, within five (5) business days from the above date or seven (7) business days if Customer is at least 65 years old.

If Customer cancels, any property traded in, any payments made by Customer under the Agreement, and any negotiable instrument executed by Customer will be returned within 10 business days following receipt by Freedom Forever of your cancellation notice, and any security interest arising out of the Agreement will be canceled.

If Customer cancels, Customer must make available to Freedom Forever at Customer's residence, in substantially as good condition as when received, any goods delivered to Customer under the Agreement; or Customer may, if Customer wishes, comply with the instructions of Freedom Forever regarding the return shipment of the goods at Freedom Forever's expense and risk.

If Customer does make the goods available to Freedom Forever and Freedom Forever does not pick them up within 20 days of the date of Customer's notice of cancellation, Customer may retain or dispose of the goods without any further obligation. If Customer fails to make the goods available to Freedom Forever, or if Customer agrees to return the goods to Freedom Forever and fails to do so, then Customer remains liable for performance of all obligations under the Agreement.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to Freedom Forever Maryland, LLC, 43445 Business Park Dr #110, Temecula, CA 92590 not later than midnight of the fifth business day (seventh if Customer is at least 65 years old) after Customer receives a signed and dated copy of the Agreement.

I, the Customer, hereby cancel this transaction.

_____
Customer's Signature

_____
Customer #2's Signature (if applicable)

_____
Date



**NOTICE OF CANCELLATION**
**(Customer Copy)**

<u>7/13/2022 | 12:18 PM PDT</u>    (Date of Transaction)

Customer may cancel this transaction, without any penalty or obligation, within five (5) business days from the above date or seven (7) business days if Customer is at least 65 years old.

If Customer cancels, any property traded in, any payments made by Customer under the Agreement, and any negotiable instrument executed by Customer will be returned within 10 business days following receipt by Freedom Forever of your cancellation notice, and any security interest arising out of the Agreement will be canceled.

If Customer cancels, Customer must make available to Freedom Forever at Customer's residence, in substantially as good condition as when received, any goods delivered to Customer under the Agreement; or Customer may, if Customer wishes, comply with the instructions of Freedom Forever regarding the return shipment of the goods at Freedom Forever's expense and risk.

If Customer does make the goods available to Freedom Forever and Freedom Forever does not pick them up within 20 days of the date of Customer's notice of cancellation, Customer may retain or dispose of the goods without any further obligation. If Customer fails to make the goods available to Freedom Forever, or if Customer agrees to return the goods to Freedom Forever and fails to do so, then Customer remains liable for performance of all obligations under the Agreement.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram, to Freedom Forever Maryland, LLC, 43445 Business Park Dr #110, Temecula, CA 92590 not later than midnight of the fifth business day (seventh if Customer is at least 65 years old) after Customer receives a signed and dated copy of the Agreement.

I, the Customer, hereby cancel this transaction.


_____
Customer's Signature


_____
Customer #2's Signature (if applicable)


_____
Date



**EXHIBIT A**
**PRODUCTION GUARANTEE**

## ARTICLE 1 DEFINITIONS

The following defined terms have the meanings set forth below:

1.1 **"Actual Annual kWh"** means, for any Production Year, the AC electricity produced by the System in kilowatt-hours (kWh).

1.2 **"Commencement Date"** means the date of initial operation of the System.

1.3 **"First Year Production"** means the estimated production of the System as found in EXHIBIT A, ARTICLE 2.1.

1.4 **"Guaranteed Annual kWh"** means, for any Production Year, the amount of AC electricity generation guaranteed, as set forth fully in EXHIBIT A, ARTICLE 2.

1.5 **"Guaranteed Energy Price"** means $0.18/kWh.

1.6 **"Production Guarantee"** means this entire EXHIBIT A.

1.7 **"Production Guarantee Term"** means the period beginning upon Commencement Date and ending on the earlier of: (a) the twenty-fifth (25th) anniversary thereof; or (b) the termination of this Production Guarantee.

1.8 **"Production Year"** means the twelve (12) month period beginning on the 1st day of the month following Commencement Date, and each successive twelve (12) month period thereafter during the Production Guarantee Term. For example, if Commencement Date occurred on March 15, each Production Year would run from April 1 to March 31.

1.9 **"Production Year Deficit Payment"** means, for any Production Year, a refund payment by Freedom Forever to the Customer in an amount calculated in accordance with EXHIBIT A, ARTICLE 3.

## ARTICLE 2 - PRODUCTION GUARANTEE

2.1 Production Guarantee. The Guaranteed Annual kWh of the System for Production Year 1 is __6799__ and is subject to all of EXHIBIT A, ARTICLE 2. Freedom Forever guarantees that in each Production Year the System will generate the Guaranteed Annual kWh for such Production Year, subject to the other terms and conditions as fully set forth in this EXHIBIT A.

2.2 Degradation. The Guaranteed Annual kWh shall degrade and reduce by five percent (5%) for the first year following Production Year 1 and by a half percent (0.5%) every year thereafter, throughout the Production Guarantee Term.

2.3 Production Year Surplus. If at the end of a Production Year, the Actual Annual kWh for such Production Year is greater than the Guaranteed Annual kWh for that Production Year, there will be no additional cost to the Customer for this surplus energy. However, this surplus will be carried over and used by Freedom Forever to offset any future Production Year Deficits.

2.4 Production Year 1 Adjustment. In the event the Actual Annual kWh for Production Year 1 is less than eighty-five percent (85%) of the Guaranteed Annual kWh described in EXHIBIT A, ARTICLE 2.1, Customer agrees to allow Freedom Forever to replace or install additional panels so that the Annual kWh for Production Year 1 meets at least eighty-five percent (85%) of the Guaranteed Annual kWh for Production Year 1, the new Guaranteed Annual kWh for Production Year 1 will be the original Guaranteed Annual kWh multiplied by eighty-five percent (85%) and the Guaranteed Annual kWh for future Production Years will be adjusted to reflect the change, and Customer shall still be entitled to submit a Performance Claim for the Production Deficit between the new Guaranteed Annual kWh and the Actual Annual kWh for Production Year 1. Freedom Forever will provide no notice of Production Year 1 Guaranteed Annual kWh adjustments made. In the event that Actual Annual kWh for Production Year 1 is greater than eighty-five percent (85%) but less than one hundred percent (100%) of the Guaranteed Annual kWh described in EXHIBIT A, ARTICLE 2.1, the new Guaranteed Annual kWh for Production Year 1 will be adjusted to the Actual Annual kWh produced in Production Year 1. Any adjustment of the Guaranteed Annual kWh is subject to the degradation schedule set forth in EXHIBIT A, ARTICLE 2.2.

2.5 No Adjustment on Surplus. Guaranteed Annual kWh will not be adjusted if the Actual Annual kWh for Production Year 1 exceeds the Guaranteed Annual kWh for Production Year 1.

2.6 Inverter System Connectivity. Freedom Forever shall install the System inverter's monitoring equipment ("Inverter System") based on either a cellular or Wi-Fi internet connection. In the event the cellular carrier or the internet wireless technology ceases to be supported in the Inverter System, Freedom Forever shall not be responsible and Customer hereby agrees, at Customer's sole cost, to upgrade the Inverter System to ensure connectivity. Customer's failure to comply with Customer's obligations under this Section shall void the Production Guarantee. If a Wi-Fi internet connection is used, Customer shall maintain and make available, at the Customer's cost, a functioning indoor internet connection with a router, one DHCP enabled Ethernet port with internet access and standard AC power outlet close enough and free of interference to enable an internet-connected gateway provided by Freedom Forever to communicate wirelessly with the Inverter System. The Customer further agrees that maintaining the foregoing high-speed internet connection is a prerequisite to the Production Guarantee.

2.7 Further Documents. Customer agrees to execute any further documents as may be necessary to allow Freedom Forever to perform under this Production Guarantee.



2.8    **Repair Parts.** When performing any work under this Production Guarantee, Freedom Forever has the right, at its sole discretion, to add on to, repair or replace all or part of the System using new, remanufactured, refurbished parts and/or products.

2.9    **Exclusion Events.** The production guarantee set forth in EXHIBIT A, ARTICLE 2.1 does not apply to any failure of the System to achieve Guaranteed Annual kWh for any Production Year, to the extent caused by any of the following exclusion events ("Exclusion Events"):
   a. Someone other than Freedom Forever or its approved service providers shuts down, installs, removes, re-installs, modifies, alters or repairs the System.
   b. Destruction, damage, or vandalism to the System, or its ability to safely produce energy, which is not caused by conduct of Freedom Forever, its employees, subcontractors, or agents.
   c. The Customer fails to perform or breach the Customer's obligations under the Agreement, which failure or breach directly and materially affects the production of the System.
   d. The Customer fails to provide access or reasonable assistance to Freedom Forever, to the extent any assistance is expressly required of the Customer under the Agreement, in diagnosing or repairing a problem, or fails to maintain the System as required by the Agreement and the recommendations of the manufacturers of the equipment which is part of the System.
   e. The Customer fails to clean the modules at least once every six (6) months.
   f. The Customer fails to take all reasonable steps to prevent any interference with the solar insolation that falls on the System.
   g. The Customer fails to promptly notify Freedom Forever upon discovery of interference with the solar insolation that falls on the System even after taking all reasonable steps to prevent such interference.
   h. Water ponding or puddling on the Customer's roof (i.e. standing water that fails to drain) not caused by Freedom Forever or its approved service providers.
   i. Damage resulting from mold, fungus and other organic pathogens, regardless of the cause.
   j. Superficial changes in the appearance of the System components due to exposure to weather and atmospheric conditions (e.g. chalking or blemishes).
   k. Shading from foliage that is new growth or is not kept trimmed to its appearance on the date the System was installed.
   l. Force Majeure Events.
   m. A power or voltage surge not caused by Freedom Forever, its employees, subcontractors, or agents, including a grid supply voltage outside of the standard range specified by the utility.
   n. Any System failure or lost production not caused by a System defect (e.g., the System is not producing power because it has been removed to make roof repairs or the Customer has required us to locate the inverter in a non-shaded area).
   o. Any System failure or lost production caused by equipment failure which is not subject to the Limited Warranty.
   p. Theft of the System other than by Freedom Forever, its employees, subcontractors, or agents.
   q. Regulatory shutdowns of the System.
   r. Changes in the electrical characteristics of the building(s) on the Property.
   s. Any failure to maintain Inverter System connectivity and/or a working high-speed internet connection pursuant to EXHIBIT A, ARTICLE 2.6.

2.10    **Transferability of Production Guarantee.** The Production Guarantee may be transferable when the Customer conveys or transfers the Property to another party. The Customer or the transferee must give notice, in writing, to Freedom Forever within twenty (20) days from the effective date of the conveyance or transfer. The transfer of the Production Guarantee shall be effective only if the transferee agrees to be bound by the conditions and terms of this Agreement. The transfer of the Production Guarantee shall be effective upon Freedom Forever's receipt of the written notice from transferee agreeing to the terms and conditions of the Agreement.

### ARTICLE 3 - PRODUCTION GUARANTEE CLAIM

3.1    **Production Claim.** If at the end of a Production Year the Actual Annual kWh for the Production Year generated by the System is less than the Guaranteed Annual kWh as mentioned in EXHIBIT A, ARTICLE 2, for that Production Year (a "Production Year Deficit"), then the Customer can make a claim about such deficit to Freedom Forever ("Production Claim"). The Customer must make any Production Claim within sixty (60) days following the end of the applicable Production Year. All Production Claims hereunder must be in writing, be identified as "Production Claim," and be delivered to us in accordance with ARTICLE 14.2 of the Agreement.

3.2    **Claim Review.** After receiving the Customer's Production Claim, Freedom Forever shall have the right to check Actual Annual kWh for the applicable Production Year and conduct on-site inspections on the Property for purpose of reviewing the production of the System and finding out the reasons, if any, which caused the Production Year Deficit. Within thirty (30) days after receiving the Customer's Production Claim, Freedom Forever will notify the Customer of approval or rejection. In the event that Freedom Forever approves a Production Claim, which means a Production Year Deficit has occur and is not caused by any Exclusion Event, Freedom Forever will make a Production Year Deficit Payment, provided first that Freedom Forever has been permitted by Customer to upgrade the system pursuant to ARTICLE 2.4 in any way that would avoid future Production Claims.

3.3    **Production Year Deficit Payment.** Within thirty (30) days after the approval, we will send the Customer a payment equal to the difference between the Actual Annual kWh for that Production Year and Guaranteed Annual kWh for that Production Year (minus any previous years' surpluses, as set forth in EXHIBIT A, ARTICLE 2.3), multiplied by the Guaranteed Energy Price Per kWh.

3.4    **Calculation upon Exclusion Events.** In the event any of the Exclusion Events, for purpose of calculating the Production Year Deficit Payment, if any, the production of the System during such event shall be deemed equal to the average production of the prior Production Years during the same time period.

### ARTICLE 4 - MAINTENANCE AND REPAIRS; EXPANSION

4.1    **Inspection of System.** The Customer agrees that Freedom Forever shall have the right, with prior notice and at times reasonably agreed to by the Customer, to inspect the System to determine if the Customer has complied with the conditions set forth in this EXHIBIT A. In the event that any inspection discloses that the Customer has failed, on or prior to the date of such inspection, to be in compliance with any of the Customer's obligations, then for purposes of calculating the Production Year Deficit Payment, if any, the production of the System during



such compliance failure shall be deemed equal to the average production of the prior Production Years during the same time period.

4.2    **Maintenance and Repair.** The Customer irrevocably grants to Freedom Forever the right, during the Production Guarantee Term, to repair, replace, and maintain the System and appurtenant equipment, and to conduct on-site measurements, including, but not limited to, reading meters and installing and observing on-site Inverter System. The Customer shall cooperate fully with the exercise of such right by Freedom Forever pursuant to this <u>ARTICLE 4.2</u>. The Customer shall further cooperate with Freedom Forever's performance of this Production Guarantee by providing utility information, and/or additional information as reasonably requested by Freedom Forever.

4.3    **Expansion and Relocation.** In the event an unforeseeable shading condition not caused by Freedom Forever exists and continues for five (5) days, the Customer agrees that Freedom Forever shall have the right to expand or relocate the System, or otherwise the Guaranteed Annual kWh for that Production Year or any future Production Years shall be reduced based upon such shading condition, and Freedom Forever will present the Customer with a proposed reduction to the Guaranteed Annual kWh for that Production Year or any future Production Years reflecting such interference.

4.4    **Expenses.** The Customer agrees that if the System needs any repair that is not the responsibility of Freedom Forever under this Agreement, or if the System needs to be expended or relocated to facilitate remodeling of the Property, the Customer will have Freedom Forever, or another similarly qualified service provider approved by Freedom Forever, perform such repairs and relocation at the Customer's expense.

4.5    **Truck Roll Charge.** If Freedom Forever and/or its subcontractor are required to inspect the System (a "Truck Roll"), Customer must provide Freedom Forever with any information reasonably related to the System issue, defect, or outage. If Freedom Forever and/or its subcontractor are dispatched for a Truck Roll and (i) the technical issue is determined to be the fault of a party other than Freedom Forever, or (ii) if Freedom Forever is unable to complete the request or otherwise perform due to the fault of the Customer, then Freedom Forever may assess any of the following charges to Customer, where applicable:

    a.  A charge in the amount of $150.00 for every two hours a technician is dispatched (the "Truck Roll Charge(s)").
    b.  Cost of any assessment performed by Freedom Forever's subcontractor, up to $750.00.
    c.  Cost of removal and reinstallation of any portion of the System, charged at $0.38 per watt plus a minimum of two Truck Roll Charges.
    d.  Cost of any tarping performed, up to $1500.00.
    e.  Any additional fees and charges determined on a time-and-materials basis.

## ARTICLE 5: TERMINATION

5.1    **Termination.** If (i) the Agreement is terminated by Freedom Forever because of a default by the Customer, or (ii) the Agreement is terminated by either party because of any extended Force Majeure Events in accordance with <u>ARTICLE 9.1</u> of the Agreement, this Production Guarantee shall be automatically terminated.

5.2    **Deficit Payment upon Termination.** If any termination occurs on a date other than the last day of a Production Year, Freedom Forever shall have no obligation to make a Production Year Deficit Payment for the Production Year in which the termination occurs.

## ARTICLE 6: NO SAVINGS GUARANTEE

6.1    **No Savings Guarantee.** Freedom Forever has not guaranteed, promised or otherwise represented any reduction in electricity costs in relation to the System that will be installed on the Property, and further provides no warranty or guaranty with respect to any cost savings from use of the System.



**EXHIBIT B**
**CHANGE ORDER FORM**

Customer Name(s): _____

Project Address: _____

Change Order Effective Date: _____

This Change Order will be incorporated by reference into and a made a part of the Supply and Installation Agreement dated _____ between _____ and Freedom Forever Maryland, LLC ("Agreement"). Except as modified by this and any previously issued Change Order, all other terms and conditions of the Agreement remain in full force and effect.

The Customer may not require Freedom Forever to perform extra or change-order work without providing written authorization prior to the commencement of work covered by the new change order. A change order is not enforceable against the Customer unless it identifies the following in writing prior to the commencement of work covered by the new change order: (1) the scope of work encompassed by the order; (2) the amount to be added or subtracted from the contract; (3) the effect the order will make on the completion date. However, failure to comply with these requirements does not preclude the recovery of compensation for work performed based upon legal or equitable remedies designed to prevent unjust enrichment.

1. Mutual Change Order. The parties agree to make the following additions or modifications to, or deductions from the Agreement as follows:

A. EXPLANATION OF CHANGES: The Customer agrees to the following:

| |
|---|
| ☐ Equipment Change: |
| From:_____ |
| To:_____ |
| |
| ☐ System Size Change: |
| From: _____ |
| To: _____ |
| |
| ☐ Performance Guarantee ("PG") Change: |
| From: _____ |
| To: _____ |
| ☐ Other Changes: |
| From: _____ |
| To: _____ |
| |

B. CHANGE IN PRICE:

| |
|---|
| **Adjusted Price:** |
| ☐   Not Applicable |
| ☐   Applicable |
| From: _____ |

**freedom** FOREVER

| To: _____ |
| --- |

**C. GUARANTEED COMPLETION DATE ADJUSTMENT:**

| **Adjusted Completion Date:** |
| --- |
| ☐   Not Applicable |
| ☐   Applicable |
| **From:**_____ |
| **To:** _____ |

**D. OTHER ADJUSTMENTS, IF ANY:**

| ☐   Not Applicable |
| --- |
| ☐   Applicable |
| **From:**_____ |
| **To:** _____ |
| Additional explanation, if any: |

2. **Accord and Satisfaction.** The Adjusted Price, if any, constitutes full payment for the completed Work hereunder and for any delay, acceleration, disruption, inconvenience, loss of efficiency, cost, or expense arising out of, or incidental to, such Work.

3. **Costs and Expenses.** Each party shall pay its own costs and expenses in connection with preparing, drafting, negotiating and executing this Change Order, including but not limited to, the fees and expenses of its advisors, accountants and legal counsel.

| 1. CUSTOMER | 2. CUSTOMER #2 (IF APPLICABLE) | FREEDOM FOREVER MARYLAND, LLC |
| --- | --- | --- |
| SIGNATURE: | SIGNATURE: | SIGNATURE: |
|  |  | /s/ Greg Albright |
|  |  | TITLE: President |
| NAME: | NAME: | NAME:Greg Albright |
| DATE: _____ | DATE: _____ | DATE: 7/13/2022 | 12:01 PM PDT |



I hereby represent that I have read and agreed to all the terms and conditions of this Agreement and I have read and separately acknowledged each disclosure, statement, and description bearing my initials or signature in this Agreement.

CUSTOMER SIGNATURE:                                    CUSTOMER #2 SIGNATURE (IF APPLICABLE):

—DocuSigned by:
Elena Pereira
—F182D02B23C3436...

E-FILED; Prince George's Circuit Court
Docket: 8/15/2025 3:42 PM; Submission: 8/15/2025 3:42 PM
Envelope: 22518248

IN THE CIRCUIT COURT FOR _Prince George's County_____

(City/County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).
   *Defendant:* You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

C-16-CV-25-004615

| | |
|---|---|
| **FORM FILED BY:** ☒ PLAINTIFF  ☐ DEFENDANT | CASE NUMBER _____ |
| | (Clerk to insert) |
| **CASE NAME:** Elena Pereira                         vs. | Freedom Forever Maryland, LLC |
| PARTY'S NAME: Elena Pereira    *Plaintiff* | *Defendant*     PHONE: _____ |
| PARTY'S ADDRESS: 4804 Olympia Ave., Beltsville, MD 20705 | |

PARTY'S E-MAIL: _____

**If represented by an attorney:**

PARTY'S ATTORNEY'S NAME: _Derek A. Hills_____   PHONE: 443-239-4626

PARTY'S ATTORNEY'S ADDRESS:  129 N. West Street, Suite 1, Easton, MD 21601

PARTY'S ATTORNEY'S E-MAIL:  dhills@dahlawoffice.com

**JURY DEMAND?** ☒ Yes  ☐ No

**RELATED CASE PENDING?** ☐ Yes  ☒ No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours  3_____ days

### PLEADING TYPE

**New Case:** ☒ Original  ☐ Administrative Appeal  ☐ Appeal
**Existing Case:** ☐ Post-Judgment  ☐ Amendment
*If filing in an existing case,* skip Case Category/ Subcategory section – go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.*)

**TORTS**
☐ Asbestos
☐ Assault and Battery
☐ Business and Commercial
☐ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☐ Fraud
☐ Lead Paint – DOB of Youngest Plt:____
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☒ Misrepresentation
☐ Motor Tort
☐ Negligence
☐ Nuisance
☐ Premises Liability
☐ Product Liability
☐ Specific Performance
☐ Toxic Tort
☐ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
  ☐ Commercial
  ☐ Residential
  ☐ Currency or Vehicle
  ☐ Deed of Trust
  ☐ Land Installments
  ☐ Lien
  ☐ Mortgage
  ☐ Right of Redemption
  ☐ Statement Condo
☐ Forfeiture of Property / Personal Item
☐ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☐ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. – Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☐ Equitable Relief
☐ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

**CC-DCM-002** (Rev. 12/2022)          Page 1 of 3

| IF NEW OR EXISTING CASE: RELIEF (Check All that Apply) |
|---|

| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
|---|---|---|---|
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☒ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☒ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☒ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☐ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.    ☐ Liability is not conceded, but is not seriously in dispute.    ☒ Liability is seriously in dispute.

| MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs) |
|---|

☐ Under $10,000      ☐ $10,000 - $30,000      ☒ $30,000 - $100,000      ☐ Over $100,000

☐ Medical Bills $ _____      ☐ Wage Loss $ _____      ☐ Property Damages $ _____

| ALTERNATIVE DISPUTE RESOLUTION INFORMATION |
|---|

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
A. Mediation        ☒ Yes ☐ No                    C. Settlement Conference    ☒ Yes ☐ No
B. Arbitration      ☐ Yes ☒ No                    D. Neutral Evaluation       ☐ Yes ☒ No

| SPECIAL REQUIREMENTS |
|---|

☒ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

| ESTIMATED LENGTH OF TRIAL |
|---|

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*
*(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☒ 3 days of trial time
☐ 1 day of trial time               ☐ More than 3 days of trial time
☐ 2 days of trial time

| BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM |
|---|

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited -** Trial within 7 months of          ☐ **Standard -** Trial within 18 months of
Defendant's response                                Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response

☐ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☐ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | |
|---|---|
| ☐ Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

August 15, 2025
Date

129 N. West Street, Suite 1
Address

Easton          MD       21601
City          State       Zip Code

/s/ Derek A. Hills                    1506160146
Signature of Attorney / Party          Attorney Number

Derek A. Hills
Printed Name

CC-DCM-002 (Rev. 12/2022)                Page 3 of 3

Reset

E-FILED; Prince George's Circuit Court
Docket: 8/15/2025 3:42 PM; Submission: 8/15/2025 3:42 PM
Envelope: 22518248

## IN THE CIRCUIT COURT OF MARYLAND FOR
## PRINCE GEORGE'S COUNTY

| | |
|---|---|
| ELENA PEREIRA<br>4804 Olympia Ave.<br>Beltsville, MD 20705<br><br>*Plaintiff,*<br><br>v.<br><br>FREEDOM FOREVER MARYLAND, LLC<br>43445 Business Park Drive, Suite 104<br>Temecula, CA 92590<br>*Serve on, Resident Agent:*<br>    CSC-Lawyers Incorporating Svc. Co.<br>    7 St. Paul Street, Suite 820<br>    Baltimore, MD 21202<br><br>*Defendant.* | C-16-CV-25-004615<br><br>Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### REQUEST TO ISSUE SUMMONS

The Plaintiff respectfully requests that the Clerk of this Court issue a writ of summons for the Defendant, to be served upon the Defendant's resident agent, for service by private process pursuant to Maryland Rule 2-112. The summonses should be delivered to: The Law Office of Derek A. Hills, 129 North West Street, Suite 1, Easton, MD 21601.

Respectfully submitted:

By:    */s/ Derek A. Hills*
       Derek A. Hills, Esq.
       The Law Office of Derek A. Hills, LLC
       129 N. West St., Suite 1
       Easton, MD 21601
       Phone: 443-239-4626
       dhills@dahlawoffice.com
       AIS No. 1506160146

       and

       */s/ Peter A. Holland*
       Peter A. Holland

The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067

*Attorneys for Plaintiffs*

**CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

14735 Main Street, Upper Marlboro, Maryland, 20772

**To:** FREEDOM FOREVER MARYLAND, LLC
SERVE ON:
CSC- LAWYERS INCORPORATING SVC. CO.
7 ST. PAUL STREET, SUITE 820
BALTIMORE, MD 21202

|  |  |
|---|---|
| **Case Number:** | C-16-CV-25-004615 |
| **Other Reference Number(s):** | |
| **Child Support Enforcement Number:** | |

**ELENA PEREIRA VS. FREEDOM FOREVER MARYLAND, LLC**

Issue Date: 8/18/2025

## WRIT OF SUMMONS

You are summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this court, to the attached complaint filed by:

ELENA PEREIRA
4804 Olympia Ave
Beltsville, MD 20705

This summons is effective for service only if served within 60 days after the date it is issued.

Mahasin El Amin  #935
Clerk of the Circuit Court

To the person summoned:
Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.
It is your responsibility to ensure that the court has your current and correct mailing address in order to receive subsequent filings and notice in this case.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued. If it is not served within the 60 days, the plaintiff must send a written request to have it renewed.

2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.

3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.

Elena Pereira vs. Freedom Forever Maryland, LLC

4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

Elena Pereira vs. Freedom Forever Maryland, LLC

**Circuit Court for Prince George's County**
**Case Number: C-16-CV-25-004615**

## SHERIFF'S RETURN
### (please print)

To: FREEDOM FOREVER MARYLAND, LLC

_____ ID# _____ of the _____
Serving Sheriff's Name

County Sheriff's office present to the court that I:

    (1) Served _____
                                                  Name of person served

on _____ at _____
        Date of service                                  Location of service

_____ by _____ with the following:
                                    Manner of service

        ☐ Summons                      ☐ Counter-Complaint
        ☐ Complaint                    ☐ Domestic Case Information Report
        ☐ Motions                     ☐ Financial Statement
        ☐ Petition and Show Cause Order    ☐ Interrogatories
        ☐ Other _____
                                  Please specify

    (2) Was unable to serve because:
        ☐ Moved left no forwarding address    ☐ No such address
        ☐ Address not in jurisdiction        ☐ Other _____
                                                  Please specify

Sheriff fee: $ _____ ☐ waived by _____

_____

                                   Date          Signature of serving Sheriff

Instructions to Sheriff's Office or Private Process Server:

1. This Summons is effective for service only if served within 60 days after the date issued. If it is not served within 60 days, the plaintiff must send a written request to have it renewed.

2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.

3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.

4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).



**null / ALL**
**Transmittal Number: 32155758**
**Date Processed: 08/29/2025**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Jessica Sumikawa<br>Freedom Forever LLC<br>43445 Business Park Dr<br>Ste 110<br>Temecula, CA 92590-3671 |
| **Electronic copy provided to:** | Legal Department |

| | |
|---|---|
| **Entity:** | Freedom Forever Maryland, LLC<br>Entity ID Number  4044665 |
| **Entity Served:** | Freedom Forever Maryland, LLC |
| **Title of Action:** | Elena Pereira vs. Freedom Forever Maryland, LLC |
| **Matter Name/ID:** | Elena Pereira vs. Freedom Forever Maryland, LLC (17819294) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Breach of Warranty |
| **Court/Agency:** | Prince George's County Circuit Court, MD |
| **Case/Reference No:** | C-16-CV-25-004615 |
| **Jurisdiction Served:** | Maryland |
| **Date Served on CSC:** | 08/28/2025 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | The Holland Law Firm, P.C.<br>410-280-6133 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

E-FILED; Prince George's Circuit Court
Docket: 8/15/2025 3:42 PM; Submission: 8/15/2025 3:42 PM
Envelope: 22518248

## IN THE CIRCUIT COURT OF MARYLAND FOR
## PRINCE GEORGE'S COUNTY

| | |
|---|---|
| ELENA PEREIRA<br>4804 Olympia Ave.<br>Beltsville, MD 20705 | *<br>*<br>*<br>* |
| *Plaintiff,* | *    C-16-CV-25-004615<br>*    Case No. _____ |
| v. | *<br>* |
| FREEDOM FOREVER MARYLAND, LLC<br>43445 Business Park Drive, Suite 104<br>Temecula, CA 92590<br>*Serve on:*<br>    CSC-Lawyers Incorporating Svc. Co.<br>    7 St. Paul Street, Suite 820<br>    Baltimore, MD 21202 | *<br>*    **JURY TRIAL DEMANDED**<br>*<br>*<br>*<br>*<br>*<br>* |
| *Defendant.* | * |

******************************************************************************

### Line of Appearance

Dear Clerk:

Please enter the appearance of Derek A. Hills and The Law Office of Derek A.

Hills, LLC, on behalf of the Plaintiff in the above-captioned matter.

Respectfully submitted:

By:  */s/ Derek A. Hills* _____
Derek A. Hills, Esq.
The Law Office of Derek A. Hills, LLC
129 N. West St., Suite 1
Easton, MD 21601
Phone: 443-239-4626
dhills@dahlawoffice.com
AIS No. 1506160146

and

*/s/ Peter A. Holland* _____
Peter A. Holland
The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230

Page 1 of 2

Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067

*Attorneys for Plaintiff*

9589 0710 5270 1710 0282 82



$22.24 US POSTAGE IMI
10 OZ FIRST-CLASS MAIL FLATS RATE
ZONE 1
RETAIL

Stamps.com
063S0014950497
17214468
FROM 21601

08/19/2025

## USPS FIRST CLASS MAIL®

Derek Hills
The Law Office of Derek A. Hills, L
129 N. West Street, Suite 1
Easton MD 21601-2774

SHIP
TO:    CSC-Lawyers Inc.  Service Co.
       Res Agent: Freedom Forever Maryland
       7 Saint Paul St Ste 820
       Baltimore MD 21202-1681

### USPS CERTIFIED MAIL™



9415 4111 0549 5864 1852 05



## IN THE CIRCUIT COURT OF MARYLAND FOR
## PRINCE GEORGE'S COUNTY

| | | |
|---|---|---|
| ELENA PEREIRA<br>4804 Olympia Ave.<br>Beltsville, MD 20705 | * | |
| | * | |
| | * | |
| | * | |
| *Plaintiff,* | * | C-16-CV-25-004615 |
| | * | Case No. _____ |
| v. | * | |
| | * | |
| FREEDOM FOREVER MARYLAND, LLC | * | |
| 43445 Business Park Drive, Suite 104 | * | **JURY TRIAL DEMANDED** |
| Temecula, CA 92590 | * | |
| *Serve on:* | * | |
| CSC-Lawyers Incorporating Svc. Co. | * | |
| 7 St. Paul Street, Suite 820 | * | |
| Baltimore, MD 21202 | * | |
| | * | |
| *Defendant.* | * | |

**********************************************************************

### Line of Appearance

Dear Clerk:

Please enter the appearance of Peter A. Holland and The Holland Law Firm, PC

on behalf of the Plaintiff in the above-captioned matter.

Respectfully submitted:

By:     */s/ Derek A. Hills*
        Derek A. Hills, Esq.
        The Law Office of Derek A. Hills, LLC
        129 N. West St., Suite 1
        Easton, MD 21601
        Phone: 443-239-4626
        dhills@dahlawoffice.com
        AIS No. 1506160146

        and

        */s/ Peter A. Holland*
        Peter A. Holland
        The Holland Law Firm, P.C.
        914 Bay Ridge Road, Suite 230

Page 1 of 2

Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067

*Attorneys for Plaintiffs*

# EXHIBIT B

## IN THE CIRCUIT COURT FOR
## PRINCE GEORGE'S COUNTY, MARYLAND

ELENA PEREIRA,

        *Plaintiff,*

    v.

FREEDOM FOREVER MARYLAND,
LLC.

        *Defendant.*

Case No. C-16-CV-25-004615

### NOTICE OF FILING OF NOTICE OF REMOVAL

Defendant, Freedom Forever Maryland, LLC ("Freedom Forever"), by its undersigned counsel, pursuant to 28 U.S.C. §§ 1331, 1332, and 1441(b), hereby notifies the Court and counsel for Plaintiff, Elena Pereira ("Plaintiff"), that Freedom Forever filed a Notice of Removal of Civil Action in the Office of the Clerk of the Court of the United States District Court for the District of Maryland, removing the above-captioned action filed by Plaintiff from the Circuit Court for Prince George's County, Maryland on September 26, 2025. A file-stamped copy of the Notice of Removal of Civil Action is attached hereto as **Exhibit A**. Pursuant to 28 U.S.C. § 1446(d), the filing of the Notice of Removal of Civil Action "shall effect the removal and the State court shall proceed no further unless and until the case is remanded."

Dated: September 26, 2025

Respectfully submitted,

POLSINELLI PC

By: */s/ D. Jack Blum*
    D. Jack Blum
    Maryland Bar No. 1212110094
    1401 I Street, NW, Suite 800
    Washington, District of Columbia 20005
    Tel: (202) 772-8483

106177685.1

Fax: (202) 315-2564
jack.blum@polsinelli.com

*Counsel for Freedom Forever Maryland, LLC*

## <u>RULE 1-313 CERTIFICATION</u>

I hereby certify that I am licensed to practice law in the State of Maryland.

*/s/ D. Jack Blum*
D. Jack Blum

106177685.1

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, a copy of the foregoing was served on all counsel of record via e-mail and first-class mail to:

Derek A. Hills, Esq.
The Law Office of Derek A Hills, LLC
129 N. West St., Suite 1
Easton, MD 21601
dhills@dahlawoffice.com

Peter A. Holland, Esq.
The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
peter@hollandlawfirm.com

*Counsel for Plaintiff Elena Pereira*

/s/ D. Jack Blum
D. Jack Blum

3

106177685.1